Joseph PAUL et al., Petitioners,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 74–2089.

United States Court of Appeals, Fifth Circuit.

Oct. 17, 1975.

 

Margaret A. Benton, James C. Burke, Miami, Fla., for petitioners.

William B. Saxbe, Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Robert W. Rust, U. S. Atty., Edward T. Sweeney, Dist. Director, U. S. Dept. of Justice, I.N.S., Miami, Fla., Troy A. Adams, Jr., Dist. Director, I.N.S., New Orleans, La., Rex Young, Atty., Gov. Reg. Sec., Crim. Div., John L. Murphy, Chief, Crim. Div., Dept. of Justice, Washington, D. C., for respondent.

Before AINSWORTH, GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Petitioners, nine Haitian nationals,[1] seek vacation and remand of an order of deportation entered by the Immigration and Naturalization Service (INS) pursuant to Title 8, U.S.C., Sec. 1251(a)(2) for entry without inspection, and of the denial of the discretionary withholding of deportation authorized by Title 8, U.S.C., Sec. 1253(h), so that they may adduce additional evidence before the INS. They ask also for an order permitting them to propound interrogatories to the United States Department of State. Finding that the petitioners are not entitled to the requested relief, we deny the petition.

Petitioners entered the United States by boat on October 17, 1973, landing near Boca Raton on the east coast of Florida. They failed to present themselves to INS officials for inspection. They concede, as they must, their deportability on these admitted facts, but challenge the discretionary denial of their applications for political asylum, relief which is available under Sec. 1253(h) when, in the opinion of the Attorney General, deportation to a particular country would subject the alien to "persecution on account of . . . political opinion."[2]

The District Director considered their claims that they would be subject to political persecution if returned to Haiti and, on the basis of statements they made to INS investigators shortly after their apprehension, and after consultation with the State Department,[3] denied relief.

A hearing was then held before an Immigration Judge. Petitioners were represented by counsel, who stipulated to the admissibility but not the weight of the statements they made to INS investigators shortly after their apprehension. Counsel, however, did not seek additional information by further questions, did not clarify that already given in support of their initial statements, and introduced no additional evidence on their behalf. Neither did he object to the introduction of the State Department recommendation or of letters notifying petitioners of the denial of their applications. The Immigration Judge held that petitioners failed to meet their burden of proving *"beyond a troubling doubt"* that they had a valid fear of persecution if returned to Haiti.

On appeal, the Board of Immigration Appeals, while recognizing that the Immigration Judge had demanded that petitioners meet an impermissibly strenuous burden of proof, nonetheless determined that petitioners had failed to prove their case by a preponderance of the evidence and dismissed their appeal.[4]

In order to qualify for discretionary withholding of deportation, the applicants must prove their departure from Haiti was politically motivated and

---

1. The nine are Joseph Paul, Elie Pierre, Ferdinand Pierre, Jean St. Fort, Forestal Joseph, Inocent Jean, Fereric De Jean, Mamotin Philippe, and William Georges.

2. Title 8, U.S.C., Sec. 1253(h) provides:

(h) The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

3. A telegram from the Office of Refugee and Migration read,

1. ACCORDING TO THE INFORMATION PROVIDED . . . FORTY-ONE OF THE GROUP OF HAITIANS [INCLUDING THE NINE PETITIONERS] MAKE NO CLAIM TO PRIOR PERSECUTION, IMPRISONMENT, OR POLITICAL AFFILIATION BEFORE THEIR DEPARTURE FROM HAITI. THEY STATE THEY CAME TO THE UNITED STATES TO FIND WORK AND SUPPORT THEIR FAMILIES IN HAITI. WE DO NOT BELIEVE ANY OF THESE HAS A VALID CLAIM TO ASYLUM ON THE BASIS OF THE FACTS PROVIDED.

4. This corrective action by the Board on appeal nullifies petitioners' complaint that they were required to meet an impermissibly strict standard of proof.

that on return they face persecution for reasons political in nature. *Matter of Janus and Janek,* Int. Dec. No. 1900, decided July 25, 1968; see *Gena v. INS,* 5 Cir. 1970, 424 F.2d 227, 232; *Kovac v. INS,* 9 Cir. 1969, 407 F.2d 102, 104–105, 107. We review the conclusion below that petitioners did not meet their burden of proof under a restricted standard:

> "Judicial review of discretionary administrative action is limited to the questions of whether the applicant has been accorded procedural due process and whether the decision has been reached in accordance with the applicable rules of law. Furthermore, the inquiry goes to the question whether or not there has been an exercise of administrative discretion and, if so, whether or not the manner of exercise has been arbitrary or capricious."

*Jarecha v. INS,* 5 Cir. 1969, 417 F.2d 220, 224, quoting *Kam Ng v. Pilliod,* 7 Cir. 1960, 279 F.2d 207, 210, cert. denied, 1961, 365 U.S. 860, 81 S.Ct. 828, 5 L.Ed.2d 823. On the basis of proofs presented, we agree that petitioners failed to make their case. The denial of discretionary relief was not arbitrary or capricious.[5]

Petitioners, however, request a second hearing on other grounds. They allege that they were denied their right to a fair hearing, and also claim entitlement under Title 28, Sec. 2347(c).[6] We find these claims to be without merit.

Petitioners present four basic grounds in support of their claim that they were denied a reasonable opportunity to develop their case: (1) the alleged ineffective assistance of privately retained counsel;[7] (2) the failure of the Immigration Judge to elicit information from them on failure of counsel to do so; (3) the failure of the INS to take administrative notice of conditions in Haiti, which would automatically entitle petitioners to the requested relief; and (4) inability to propound interrogatories to the State Department in order to discover the basis of the recommended denial of their applications, thereby rendering it impossible for them to challenge effectively its weight or admissibility.

■ Deportation hearings are deemed to be civil, not criminal, proceedings. *Jolley v. INS,* 5 Cir. 1971, 441 F.2d 1245, cert. denied, 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262; *Barthold v. INS,* 5 Cir. 1975, 517 F.2d 689 and cases therein cited. Petitioners, therefore, do not contend, nor could they, that the sixth amendment right to counsel applies. "It is clear that any right an alien may have in this regard is grounded in the fifth amendment guarantee of due process rather than the sixth amendment right to counsel." Id. at 690. Yet, "[t]he existence, let alone the nature and scope, of such a right has not been established." Id. at 690.

But deportation proceedings, however labelled, entail drastic consequences for an alien, especially one who seeks to invoke the protections afforded by Sec. 1253(h).

■ Aliens have a statutory right to the presence of counsel, but not at

---

5. Petitioners concede this in their Reply Brief.

6. (c) If a party to a proceeding to review applies to the court of appeals in which the proceeding is pending for leave to adduce additional evidence and shows to the satisfaction of the court that—
 (1) the additional evidence is material; and
 (2) there were reasonable grounds for failure to adduce the evidence before the agency; the court may order the additional evidence and any counter-evidence the opposite party desires to offer to be taken by the agency. The agency may modify its findings of fact, or make new findings, by reason of the additional evidence so taken, and may modify or set aside its order, and shall file in the court the additional evidence, the modified findings or new findings, and the modified order or the order setting aside the original order.

7. They also point to their lack of education, inability to speak English, and consequent lack of understanding that they had the burden of proving their fear of persecution based on the evidence they produced at that hearing. Because we do not find that counsel was ineffective, see infra, we do not find that these factors undermined the fairness of the hearing.

government expense. Title 8, U.S.C., Sec. 1362. Petitioners received the benefit of this statutory provision. In this court, they do not assert an independent "right to counsel," to be judged in accordance with standards set out in *MacKenna v. Ellis*,[8] 5 Cir. 1960, 280 F.2d 592, 599, cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78. They argue only that the representation afforded them was so deficient as to impinge upon the fundamental fairness of the hearing, in violation of the fifth amendment due process clause. Accordingly, we follow *Barthold* in analyzing the proceedings in terms of their fundamental fairness.

In support of this contention, petitioners point out that counsel stipulated to the admissibility of their statements to INS investigators made in counsel's absence. But these statements would have been admissible without stipulation, unless their admission made the proceedings unfair.[9] Since no question is raised as to their voluntariness or their accuracy, it did not.

■ Letter notifications of the denial of asylum were admitted without objection. Petitioners do not suggest, however, that these letters were inadmissible. Counsel can not be found ineffective for failure to raise meritless objections. See *Burston v. Caldwell*, 5 Cir. 1975, 506 F.2d 24.

Petitioners also criticize counsel's failure to object to the introduction into evidence of the State Department's recommendation. The Immigration Judge removed any basis to find counsel ineffective in this regard when he stated, prior to any proffer by the government attorney:

There is one thing *I will insist on at this time* and *I do want offered* into evidence and I will ask for it *on my own motion*, the letter or a cable or whatever notification was sent by the Department of State on the initial request made for asylum. (emphasis added)

Further, petitioner's attorney did challenge admissibility of the recommendation on appeal to the Board of Immigration Appeals, and the Board, while noting that counsel had failed to object before the Immigration Judge, nevertheless considered the challenge to the propriety of its receipt into evidence on the merits. Whatever error counsel made initially, therefore, which would undermine the "fundamental fairness" of the hearing was cured by his subsequent appeal and the Board's ruling on the merits of this claim.[10]

The basic thrust of petitioners' challenge to their attorney's conduct, as we understand it, is that counsel, by not questioning them and instead relying solely upon their prior self-serving and summary allegations of (a) their opposition to the Haitian government, (b) their participation in altercations with the Haitian authorities, and (c) punishment of their family members, failed to develop fully the basis of their fears of persecution for political reasons if returned to Haiti. Their new attorney argues in his brief to this court that, had counsel questioned them,

No doubt, further testimony from him [Joseph Paul] and the remaining petitioners would bring forth material evidence of politically motivated escapes, and their real fear of death or imprisonment. (emphasis added)

**8.** In *MacKenna v. Ellis*, 5 Cir. 1960, 280 F.2d 592, 599, cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78, the right to counsel was interpreted as

the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance.

**9.** *Jolley*, supra, 441 F.2d at 1255; see *Martin-Mendoza v. INS*, 9 Cir. 1974, 499 F.2d 918,

cert. denied, 1975, 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810; *Strantzalis v. INS*, 3 Cir. 1972, 465 F.2d 1016; *Ah Chiu Pang v. INS*, 3 Cir. 1966, 368 F.2d 637, cert. denied, 1967, 386 U.S. 1037, 87 S.Ct. 1490, 18 L.Ed.2d 601.

**10.** In any event, the failure to object did not infect the fairness of the proceedings because there was no reliance on the State Department recommendation. See discussion, infra.

This "material evidence" is not detailed to *any* extent, nor is its content even hinted at.

 A claim of the denial of due process because of ineffective assistance of counsel must allege sufficient facts to allow this court to infer that competent counsel would have acted otherwise. Petitioners' claims are totally deficient in this regard. Their generalized allegations are insufficient to support an inference that they possess material information not previously disclosed because of counsel's incompetence, and thus afford no basis for concluding that prior counsel's failure to inquire further fatally infected the fairness of the hearing. Put more simply, we are unable to conclude that counsel's failure to inquire resulted from incompetence and not, as the government suggests, because petitioners possess no further evidence which would benefit them. We do not find that counsel's inaction deprived petitioners of a fair hearing with a reasonable opportunity to develop their proof.

 Petitioners' second ground for challenging the adequacy of the hearing was the failure of the Immigration Judge to question them when counsel failed to do so. They cite *Kovac, supra,* 407 F.2d 102, as requiring that the Immigration Judge is under an affirmative burden to elicit information from aliens in order to insure a full and fair inquiry. This is an overbroad reading of *Kovac.* The petitioner in that case did not understand English, was questioned by the government attorney through an interpreter, and was not represented by counsel. The ostensible purpose of the hearing was to determine whether to grant a continuance to allow time to file a formal application for asylum, but it was inexplicably converted into a hearing on the merits. In these circumstances, Kovac's later assertions that he did not fully understand the nature of the proceedings or the meaning of questions asked, supported on the record by his enigmatic answers to questions, fully justified a remand to give him a reasonable opportunity to present his proofs-proofs which, we might add, were laid out before the Court of Appeals in considerable detail. *Kovac* is thus distinguishable in this respect from our case. Finally these petitioners do not point out how they would conceivably have benefited from questioning by the Immigration Judge.

 Petitioners also point to the failure of the Immigration Judge to take administrative notice of conditions in Haiti as prejudicial to their rights. But this did not deprive them of a fair hearing or constitute an abuse of discretion. Many Haitians seek refuge in this country, not for political reasons, but for economic ones. See Jervis Anderson, "A REPORTER AT LARGE, THE HAITIANS OF NEW YORK," *The New Yorker* magazine, March 31, 1975, p. 50 et seq. We do not minimize the claims of those who in fact flee Haiti for political reasons and legitimately fear persecution on return. Nevertheless claims are easily made. To require the INS to take administrative notice of conditions in Haiti as petitioners define them would confer "blanket asylum status" upon those who are not in fact political refugees. See Id. at 60.

Petitioners challenge finally the fairness of the hearing because they had no opportunity to determine the basis of the State Department recommendation, either through interrogatories directed to or cross-examination of the author, and that its introduction into evidence without foundation was therefore arbitrary and capricious. *Asghari v. INS,* 9 Cir. 1968, 396 F.2d 391, was the case of an alien who contended that he was denied a fair hearing on his application for relief under Sec. 1253(h). The court held that advice received from the State Department was admissible, as coming from a "knowledgeable and competent source." Id. at 392. In *Kasravi v. INS,* 9 Cir. 1968, 400 F.2d 675, 677, however, the court questioned the competency of these State Department letters:

Such letters from the State Department do not carry the guarantees of reliability which the law demands of

admissible evidence. A frank, but official, discussion of the political shortcomings of a friendly nation is not always compatible with the high duty to maintain advantageous diplomatic relations with nations throughout the world. The traditional foundation required of expert testimony is lacking; nor can official position be said to supply an acceptable substitute. No hearing officer or court has the means to know the diplomatic necessities of the moment, in the light of which the statements must be weighed.

Id. at 677, n. 1. Nevertheless, because of the limited scope of review of discretionary denials of deportation and because of its belief that courts may not "insist that the Attorney General's opinion be based solely on evidence which is disclosed to the alien," Id. at 677, quoting *United States ex rel. Dolenz v. Shaughnessy*, 2 Cir. 1953, 206 F.2d 392, 394, (which found no denial of procedural due process where the Commissioner relied upon matters outside the record), the 9th Circuit affirmed the Board's order in *Asghari*.

The telegram complained of, quoted in n. 3, supra, stated that none of the petitioners claimed persecution, imprisonment, or political affiliation prior to leaving Haiti, but stated that they came to this country to find work. Our examination of the statements in the record, presumably the ones sent to the State Department, reveals the opposite. The telegram is nonresponsive to the claims of beatings and imprisonment, and to petitioners' express disclaimer of economic motivation.

■ Petitioners' challenge, in view of the potential unreliability of the recommendation and its nonresponsiveness, might be persuasive if it appeared from the record that the telegram influenced the decision of the Immigration Judge and the Board of Immigration Appeals, but such is not the case. Rather, the basis for the decisions below was the insufficiency (and/or unreliability) of petitioners' own statements in discharging their burden of proving that they possessed a well-founded fear of political persecution if deported.[11] See *Hosseinmardi v. INS*, 9 Cir. 1969, On Petition for Rehearing, 405 F.2d 28.

In sum from careful review of the entire record we conclude that petitioners were not denied their right to a full and fair hearing.

■ Petitioners also request a second hearing under Title 28, U.S.C., Sec. 2347(c), see n. 4, supra. To be entitled to Sec. 2347(c) relief, they must show "to the satisfaction of the court" that the additional evidence is material and explain in a satisfactory manner their failure to adduce it before the administrative agency.

The evidence alleged to be material is (1) the further testimony of petitioners, referred to earlier; (2) the fact that petitioners, because of their fear of persecution, voluntarily remained in INS custody for four months until their release on bond, despite their knowledge that they could secure release if they waived their applications to withhold deportation; (3) testimony from an official in charge of the detention facility that one Haitian committed suicide after receiving notice of impending deportation and after informing petitioners that he would kill himself rather than be returned to Haiti, that a second attempted

---

11. The Immigration Judge, in his order denying relief, stated,

> In examining the credentials presented by the respondents, I find that they have failed to meet the requirement of showing that they have a valid fear. Each statement, while differing in fact, do not add up, in my opinion, to a conclusion that any of the respondents engaged in that sort of activity which precludes their return to their native country because of opposition to the

Government or because they had engaged in such an activity for which they would be persecuted by the Government of Haiti.

On appeal, the Board of Immigration Appeals concluded that

> the respondents have not shown that their fear of persecution if deported to Haiti is well-founded. We shall accordingly affirm the immigration judge's order and dismiss the appeal.

to starve himself to death until advised by counsel that his claim would be judicially reviewed, that the remainder threatened suicide rather than be deported, and that such official requested the INS to remove petitioners because he believed the threats were real; and (4) that arrangements were made for their removal but were obviated when they were released on bond.

Petitioners excuse their failure to present this evidence earlier by pointing to the alleged ineffective assistance of counsel. Acknowledging that the suicide, attempted suicide, and threats to commit suicide could not have been raised at the hearing they' fault their attorney for failing to request a reopening prior to the appeal to the Board.

We do not find the evidence which petitioners seek to adduce material, nor their excuse reasonable. As stated earlier, their intended testimony has not been delineated sufficiently to enable us to assess its importance or to fault counsel for not presenting it originally.[12]

That petitioners remained in custody for four months rather than face deportation indicates no more than that they wished to pursue every avenue open to them in order to remain in this country. The suicide of one and attempted suicide of another is not, without more, and contrary to petitioners' contention, evidence of their fear or indicative that their fear is well-founded or politically motivated, see *Kovac,* supra, 407 F.2d at 105. This is especially true where so many Haitians come to this country seeking economic relief. No relationship has been alleged which would allow us to impute the consequences faced by one to the others. Their own threats are self-serving and no more than cumulative to the statements in evidence.

In view of the insubstantiality of this evidence we do not view former counsel's failure to request a reopening as grounds for remand. Moreover, petitioners were free, during the pendency of the appeal before this court, to request a reopening before the Board and failed to do so. See 8 C.F.R. Secs. 3.2 and 103.5. Their excuse, that they believed they no longer had the right to petition the Board to reopen because the Board would then have "a discretionary right to grant or to reject the motion to reopen, which . . . , could overrule the United States Court of Appeals," petitioners' Reply Brief at pp. 5–6, merits no comment.

Petitioners have failed to demonstrate that they were denied a fair hearing or that a remand would serve any useful purpose.

Petition denied.

GODBOLD, Circuit Judge (dissenting):

I cannot join in an affirmance. In the interest of justice and under the powers granted by 28 U.S.C. § 2106,[1] the order of the Board should be vacated and the cause remanded to permit further development of the evidence and reconsideration. Several factors coalesce to require that result.

(A) The Immigration Judge put an impermissibly strenuous burden of proof on petitioners in the form of "beyond a troubling doubt." On appeal the Board recognized this and nonetheless determined that petitioners had failed to prove their case by a preponderance of the evidence. Possibly the majority is correct that the Board's action corrected the Immigration Judge's error, but along with other factors this mistake bears on my conclusion.

(B) The statements given by petitioners were their only evidence on the issue of threatened persecution. The Immi-

---

12. Compare 8 C.F.R. Sec. 103.5, requiring a party seeking to reopen a proceeding before the administrative agency to state the new facts which the applicant seeks to prove.

1. Section 2106 is applicable to proceedings for review of an administrative order. *See Greater Boston Television Corp. v. FCC,* 149 U.S. App.D.C. 322, 463 F.2d 268, 277 (1971).

gration Judge made no credibility findings—indeed he implies that he accepts the statements as true. I set out in the margin some of the statements, and extracts from others.[2]

2. Joseph Paul: I ran away from trror of Duvalier's GANG, from its havoc of killing thousands on thousands; after walking too long in the ocean of the blood of my brothers who injustly got killed, unjustly murdered; injustly crushed down; injustly depossessed; unjustly thrown in jail; unjustly raped (young-girls) forced to be separated (husbands and wifes); forced to be hated and to hate the dearest ones; forced to swell up all filtiness of the GANG; twice I also, I've been beaten, crushed down, depossessed; I was kept 20 days in a secret jail of the GANG. I have been hidden for seven months. Many times I have tried to run away I couldnt; they refused me visas of going out. I am here to save my life, not for food or the betterment of life. If U. S. can't help me, please send me to another place (like Congo.

Elie Pierre: I was in Nassau, not as a job seeker but as a freedomseeker, even Tonton Macoutes in Haiti seek to run away from Duvalier, the despotist. I did not go to Nassau because I was hungry, I did run away to save my life which is a gift of God. I think every body loves his life and seeks to conserve and preserve it as long as he can. The millions that got killed is because they could not find way to escape. They killed one of my brother by running away from Duvalier GANG. Several of my relatives have to change their names and addresses, even town after the prematured death of my brother. Due to the poverty of Haiti, poeple keep saying that we come to U. S. for the betterment of life, this is a big weapon they use to have reason to send us back. Because we are poor we have to die in silence, being accused and charged with what we ignore.

. . . If we were sent back God will revenge our blood.

Ferdinand Pierre: Who will be queit after losing his father for a selfish cause, after seeing his father being struck slapped unjustly, bleeding from head to the palms of feet, at last died tortured that was in 1973, while Jean-Claude rules. Few months after the death of my father, my mother jailed and died asphyxated? Who will be silent after being witness such a scandale, such a tragic fact, mother and father tragic death by a so-called republic regime? Did I have not right to escape? After having escaped, do I have to be willing to go back and produce myself to the same tonton macoutes? to the same clic, the same GANGSTERISM to be eaten up? No, no never, I'll never want to go back. We have no security in Haiti; no right of enjoyment of your life, no right of choice for nothing. There is one but USURPERS rule. I'wll not go back to Haiti. I know I'll be killed.

Forestal Joseph: I have never had peace in Haiti; for so many years I was tourmented by the Macoutes; unjustly they have beaten me cruelly; unjustly they broke into my house and took my belongings and did some other mean treatments to many of my parents. The tribulation that Duvalier's regime causes to my parents is inhuman, the few who are surviving flew from Haiti. One of them said to me, if I didn't leave Haiti he will kill me. I know they have power to kill, they have power to set free. I have fought with them; they know me very well. That is only reason makes me leave Haiti. I hate the government; I can't live under such a regime, and I know by my negative attitude if I return I will be killed. The Macoute Pierre slapped me and threatened me not once but several times.

Inocent Jean: I have left Haiti 8/9/73 and arrived in Nassau 8/13/73. The reason I Have escaped from Haiti is thsi: I have been bent many time and some of my folks get killed.

After the palace getting in fire every thing became hardest for us. When Jean-Claude first in power, he claimed that every body must live a decent live. He asked that every body to write him to express to him my feeling. I did say the right thing in my letter. I told him my wish for him that he will not do the same thing that his father did. As answer, he sent for me to explain my letter. In his face I told him the same thing I have writen and more. He laughed and shaked my hand and let me go. Three days after a Macoute arrested me and said that I was complotting against the regime. I told him I will not deny what you say, if could I would do it, because I feel tired with this government, there is no freedom for the ruled. Why should I not talk freely according my conscience. He said that I should say nothing against Jean-Claude, I told him I hate Jean-Claude. Hearing that, he became so angry to kill me. I didn't sleep in my house that night I was afraid. They sent for me in my house, the same night. They didn't find me. Jean-Claude said he must keep his father doctrine in order to rule for life. Whosoever speaks against him must die. If U. S. can' or refuse to help me, please, send me to another country as Africa.

Federic DeJean: My profession is marine (sea-faring). I used to sail from Arcahaie to Gonaives, and from Gonaives to Arcahaie. Since some other sea-faring or sea-going took some other haitians to Nassau and they couldnt find exact which ones, they started to round up any one they know as sea-going. Some Tonton (secret police) accused me as one of those sea-going. They sent after me. I fought with one of them, and flew. I didn't sleep in my house that night. The GANG

The contents of these statements are not mere generalities but specifics. I summarize some of them in cold language, largely stripped of the fervor of the originals.

Joseph Paul: (1) He fled from fear of Duvalier's "gang" which has killed thousands of persons. (2) Others have been murdered, raped, thrown in jail, etc. (3) He was kept in jail 20 days by the "gang" and has been hidden for seven months. (4) He has tried to run away but has been refused a visa. (5) He is in the United States to save his life.

Elie Pierre: (1) He fled from Haiti to Nassau "to save my life which is a gift of God." (2) His brother was killed and relatives had to change their names and addresses.

Ferdinand Pierre: (1) Both his father and his mother died in 1973, his father after torture, in prison at the hands of the Haitian regime. (2) If he goes back he will fall into the hands of the same police and he knows that he will be killed.

Forestal Joseph: (1) For many years he has been tormented by the police [the Haitian secret police, or Tonton Macoutes] and has been beaten by them. (2) The police have broken into his home and taken his possessions. (3) They know that any one who runs to Nassau will join the other opposed groups there.
. . . [T]he same regime, the men, same GANG, for years and years keeps killing, killin and killing any one who refuses to bow head and swell up their throwing up and their filtiness msut die, . . .

D. Dikenne: I used to brave the Duvalier Macoutes and fuss with them. . . . But one day after having an altercation with one of the most powerful Macoutes (L.Lubain) he has jailed me for 2 months. I have paid $50.00 to be free from jail, a temporary release. In that same week, he came in the night to kill me, I have escaped through a window and went to Nassau.

William Georges: I left Haiti August 14, 1973, for one thing which is politic. The fact is we completed under ground against Duvalier, the Tyrant. So many a time we fought against Tontos, the police of the Regime. So many a time I used to curse it by calling them gangs, blodthirsty After killing my oncle (Pierre Georges and beating to death another one for being against the government) putting have inhumanly treated his parents. (4) A specific policeman told him that if he did not leave Haiti he would kill him. (5) He has fought the Tonton Macoutes, he is well known to them and his attitude toward the regime is known, and if he returns to Haiti he will be killed.

Inocent Jean: (1) He has been beaten many times and some of his family killed. (2) After writing a letter to Jean-Claude (head of the "new regime" in Haiti) he was brought before Jean-Claude to explain and did so. Three days later he was arrested for plotting against the realm. He told the police that he hated Jean-Claude and they became angry enough to kill him. He fled his home, police came to his home that night but were unable to find him. "Whosoever speaks against him [Jean-Claude] must die."

Federic de Jean: (1) He is a sailor. The police came to arrest him because vessels were taking Haitians to Nassau and seamen were suspected of involvement. He fought with the police and fled and did not sleep in his home that night. (2) If one is caught fleeing to another country in search of freedom "they cut off his life." (3) "The same regime, the men, same GANG, for years and years keeps killing, killin and killing so many of my good friends in jail, friends who have been disappeared. Twice I have been beaten by Mr. Gilbert; once I have been kept for 23 days in his own private home. Three times he got money from me, pretending that he would save me from being killed by the others.

My father and mother got killed by these Princes of Haiti. I've enough under this regime. I would like to go back today, but not live and ruled by Jean-Claude and his mother and all the clic-rulers since since 1957.

Phillipe Marmotel: What makes me hate this regime, because it is a tyrant and the most cruel government—Why it has to kill my father and mother to depossess them? Why have I to be mistreated and tortured for quoting a fragment of the Haitian Constitution. . . . If we had weapons we would fight the regime, but we are poor, weak. . . . I am not going back to Haiti, I will be murdered if I will be sent back. I love my life. Send me to Congo. Please, please, please.

any one who refuses to bow head and swell up their throwing up and their filtiness msut die, . . . "

D. Dikenne: (1) He used to "brave" the police and "fuss with them." (2) He had an altercation with a named powerful police officer who had him jailed. He secured a temporary release and that same week the officer came in the night to kill him. He escaped and went to Nassau.

William Georges: (1) He fought the police underground. (2) The police killed one of his uncles and beat another one to death for being against the government and put his good friends in jail. Other friends have disappeared. (3) A named police officer has beaten him twice, kept him in a private home for 23 days and has gotten money from him three times. (4) His father and mother were killed by "these Princes of Haiti."

Responding to these statements, considered collectively, the Immigration Judge found:

> In examining the credentials presented by the respondents, I find that they have failed to meet the requirement of showing that they have a valid fear. Each statement, while differing in fact, do not add up, in my opinion, to a conclusion that any of the respondents engaged in that sort of activity which precludes their return to their native country because of opposition to the Government or because they had engaged in such an activity for which they would be persecuted by the Government of Haiti.

If the statements, or substantial parts of them, are accepted as credible, the conclusion that petitioners failed to meet the burden of proof is, to put it baldly, astonishing. Yet the Immigration Judge made no credibility findings—indeed his finding, quoted above, implies that he accepted petitioners' statements as true.

On appeal the Board of Immigration Appeals found that even when judged by the correct and less stringent burden of proof the petitioners had failed to show that their fear of persecution if deported to Haiti was well founded. The Board's position on credibility is not stated. In this court INS implies that we should treat the statements as not credible.

(C) The Immigration Judge asked for, and insisted that there be introduced into evidence, a telegram from the Office of Refugee and Migration Affairs of the State Department stating the views of the Department on whether petitioners should be deported.[3] The telegram said:

> ACCORDING TO THE INFORMATION PROVIDED . . . FORTY-ONE OF THE GROUP OF HAITIANS [INCLUDING THE NINE PETITIONERS] MAKE NO CLAIM TO PRIOR PERSECUTION, IMPRISONMENT, OR POLITICAL AFFILIATION BEFORE THEIR DEPARTURE FROM HAITI. THEY STATE THEY CAME TO THE UNITED STATES TO FIND WORK AND SUPPORT THEIR FAMILIES IN HAITI. WE DO NOT BELIEVE ANY OF THESE HAS A VALID CLAIM TO ASYLUM ON THE BASIS OF THE FACTS PROVIDED.

The statements referred to above are presumably the ones sent to the State Department—the record reveals no others. As Judge Simpson points out, these statements reveal precisely the opposite of what the telegram said with respect to prior persecution, imprisonment or political affiliation, and, additionally, the telegram is nonresponsive to the claims of beatings and imprisonment and to petitioners' express disclaimers of economic motivation.

I do not understand the conclusion of the majority, footnote 10 and related discussion, that there was no reliance on

---

3. Counsel did not object to introduction into evidence of the telegram. It was not necessary that he do so since the Immigration Judge made clear, prior to any proffer by the government attorney, that he would insist upon the telegram, wanted it offered into evidence, and would ask for it on his own motion.

the State Department recommendation by either Immigration Judge or Board. The opinion of the Immigration Judge does not refer to it as a basis for decision, but on appeal the Board of Immigration Appeals held with respect to the telegram:

> We hold that the immigration judge properly relied on this evidence. The advice came from a reliable, knowledgeable and competent source [citations].

All members of this panel now agree that regardless of how good the source, the report was wrong. Thus it now appears that whether the Immigration Judge did or did not rely on the advice, the Board, in affirming, *thought* he had relied and considered such reliance to have been appropriate. What the Board would have done had it correctly found the report was wrong one can only speculate.

(D) Despite the strength of the statements, counsel for petitioners states in his reply brief that he concedes that the INS did not act arbitrarily or abuse its discretion on the lack of persecution issue. See footnote 5 of majority opinion. While I do not reach the issue of arbitrary action and abuse of discretion, I do not understand why the concession was made.

(E) Petitioners seek an order of this court under 28 U.S.C. § 2347(c) granting leave to adduce additional evidence before the agency, including alleged evidence that a member of their group committed suicide and another attempted suicide rather than return to Haiti. Judge Simpson's opinion brushes aside this evidence as either not material at all or merely cumulative to the statements. It is circumstantial evidence that members of the group were motivated by feelings stronger than mere economic interest in remaining in the United States. In this case consequences faced or feared by one person in the group are relevant to other persons in the group because throughout the INS has considered the statements of the individuals collectively.

For another and less narrow reason, the petitioners should be permitted a reopening to present additional evidence. Their brief, asking that relief, was filed six months before the case was orally argued. In response, and by a brief filed five months before oral argument, INS asked that we not order any reopening because petitioners failed to ask INS to reopen. Regulations permit a motion for reopening, 8 CFR 103.5, which must describe any judicial proceeding of which the order "has been or is the subject." Counsel for petitioners says he thought jurisdiction over the validity of the order was vested in this court when the petition for review was filed and considered, so that, either as a matter of law or of respect for this court, he could not proceed contemporaneously before the agency. Pretermitting whether that position is legally correct, it is not an unreasonable reaction. During the six months after petitioners' brief requested a court-ordered reopening INS tendered no administrative reopening but stood, and continues to stand, on its position that there must never be any reopening, court-ordered or administratively granted, because petitioners followed the wrong procedural route. I cannot say that this ultra-technical argument is not available to INS. I do say that it is not in keeping with what INS represents in its brief is its policy under the United Nations 1967 Protocol Relating to the Status of Refugees, which is that it stands ready to reconsider any requests for political asylum.[4]

4. INS quotes from a publicly distributed document, 51 Interpreter Releases No. 18, at 139 (1974):

"Those Haitians whose requests for asylum have been denied, and their counsel, have been informed that they are free to request reconsideration if they have additional evidence to present."

There is no evidence that these petitioners and their counsel were so informed other than to the extent that the existence of an appeal to the Board of Immigration Appeals, and the existence of 8 CFR 103.5, would serve that purpose.

The INS suggests to us no prejudice, or even inconvenience, in permitting further development of the evidence and a reconsideration which could still the doubts that swirl about this case. Hopefully the INS, having vindicated its position that it should not be required to reconsider, will, in the interest of justice, exercise its power to do so voluntarily.