Florentino A. ZAMORA et al.,
Petitioners,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

Roberte NOEL, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

Nos. 814, 774, Dockets 75–4093, 75–4101.

United States Court of Appeals,
Second Circuit.

Docket 75–4093 Argued March 12, 1976.
Docket 75–4101 Argued March 11, 1976.

Decided April 29, 1976.

---

Stephen Singer, New York City (Steven S. Mukamal, and Barst & Mukamal, New York City, of counsel), for petitioners Florentino A. Zamora, Maria L. Zamora and Roberto Zamora.

Claude H. Kleefield, New York City, for petitioner Roberte Noel.

Thomas H. Belote, Sp. Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty., S. D. N. Y., and Mary P. Maguire, Sp. Asst. U. S. Atty., New York City, of counsel), for respondent.

Before FRIENDLY, MULLIGAN and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

These petitions to review decisions of the Board of Immigration Appeals which dismissed appeals from orders of Immigration Judges (IJ) denying requests, under § 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), for stays of deportation on the ground that "the alien would be subject to persecution on account of race, religion, or political opinion," are typical of an unusually large number of such petitions that have recently reached us.

*The Facts and the Prior Proceedings*

Florentino Zamora is a 40-year old native and a citizen of the Republic of the Philippines. He entered the United States as a non-immigrant visitor for business on October 10, 1970 and was authorized to remain here until December 30 of that year. He requested and received a number of extensions by which permission was given for him to remain in the United States until October 30, 1971.

On January 16, 1971, Maria Zamora and her infant son Roberto, also citizens of the Philippines, entered the United States as visitors for pleasure. They also requested, and were granted, several extensions of their permitted stay until January 15, 1972. Maria is now 39 years old; her son is 5.

Having overstayed their authority to remain in this country, the Zamoras became subject to deportation proceedings under § 241(a)(2), 8 U.S.C. § 1251(a)(2), and the Immigration and Naturalization Service (INS) served Orders to Show Cause upon them. On February 14, 1973, the Zamoras applied to the District Director in New York for a grant of political asylum, see 8 C.F.R. § 108, and Operating Instructions 108, issued pursuant to the general authority granted the Attorney General by § 103(a), 8 U.S.C. § 1103(a). A summary of the basis for this request was forwarded by the District Director to the Office of Refugee and Migration Affairs (ORM) of the Department of State. In a reply dated February 27, 1974, the ORM reported that the Department did "not find that the Zamora family [had] made a valid claim to asylum. . . . [The Department believed] that the Zamora family would be able to live in the Philippines at this time free of restraints other than those imposed on all Philippine citizens. . . . On the basis of the information thus far submitted, [the Department was] unable to conclude that the Zamora family should be exempted from regular immigration procedures on the grounds that they would suffer persecution on account of race, religion, nationality, political opinion, or membership in a particular social group should they return to the Philippines." The application for asylum was denied. On May 24, 1974, a deportation hearing was held before an IJ. The Zamoras conceded their deportability. At the hearing they made applications for a

withholding of deportation pursuant to § 243(h).[1]

To establish the likelihood of persecution on his return to the Philippines, Florentino Zamora testified that in 1969 or 1970 he had participated in street demonstrations directed against the government of President Marcos and that some of the demonstrators had been subsequently jailed. Both Mr. and Mrs. Zamora testified to suppression of civil liberties in the Philippines. Mr. and Mrs. Zamora testified that efforts to question relatives remaining in the Philippines regarding the family business and the political situation had elicited only evasive responses and refusals to comment. At this juncture the INS trial attorney introduced into evidence the Department of State's letter. No objection was made.

In his decision, the IJ, after noting the evidence introduced by the Zamoras, also reviewed three newspaper clippings submitted by them which reported arrests of various dissidents in the Philippines; an advertisement soliciting letters to Congress urging the suspension of American aid to the Philippines so long as human rights there were repressed; and the Zamoras' claim that their cousin was married to the nephew of an imprisoned Philippine Senator.

On the basis of this evidence, the IJ found that "Nothing presented establishes that the Philippine government has been or now is aware of respondents or has any interest, any adverse interest, in them." He noted "parenthetically" that the Department of State had concluded that the Zamoras had not made out a valid claim for asylum, and went on to quote the relevant passages of the State Department letter. Nevertheless, the IJ added that in arriving at his own decision to deny the plea for suspension, he had not considered the views of the Department of State.

On April 17, 1975, the Board of Immigration Appeals dismissed an appeal from the IJ's decision, saying:

> We have reviewed the record . . . and conclude that the decision was correct. In an official communication to the Service the State Department indicated its belief that the Zamora family would be able to live in the Philippines free of restraints, other than those imposed on all Philippine citizens by the terms of various martial law decrees. The respondents have failed to show a well-founded fear that their lives or freedom would be threatened in the Philippines on account of their race, religion, nationality, membership in a particular social group, or political opinion. [Citations omitted.] We are satisfied, therefore, that the respondents would not be persecuted if deported to the Philippines.

The filing of this petition for review on May 22, 1975 has entitled the Zamoras to an automatic stay of deportation, see § 106(a)(3) of the Act, 8 U.S.C. § 1105a(a)(3).

Roberte Noel is a 39-year old Haitian citizen who entered the United States on October 27, 1969, on a nonimmigrant visitor's visa for pleasure. Authorized to remain here until July 25, 1970, she failed to depart and, on March 27, 1973, an Order to Show Cause was issued pursuant to § 241(a)(2).

After the commencement of deportation proceedings, Mrs. Noel applied to the District Director in New York for political asylum. The deportation hearing was adjourned in order to give the Director time to consider the application; he requested an opinion from ORM which, on April 10, 1974, responded that "We do not believe Mrs. Noel has made a valid case for political asylum." On April 17 the Director denied

---

1. This section provides:
 *Withholding of Deportation.*
 (h) The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.
 The Attorney General has delegated this authority to the Immigration Judge, 8 C.F.R. § 242.8(a), and to the Board of Immigration Appeals, 8 C.F.R. § 3.1.

Mrs. Noel's request for asylum, and the deportation hearing was resumed.

At that hearing on September 10, 1974, petitioner, conceding that she was deportable, applied for withholding of deportation as provided by § 243(h) on the grounds that she faced persecution on return to Haiti.

Noel's application for § 243(h) status recounted her past in Haiti and the present condition of her family there. Her father, by marriage to a woman who was not her mother, became the brother-in-law of former Haitian President Magloire and had taken her into his new home. The father was formerly an officer in the Haitian army during the Magloire regime which ended in 1957 with the ascendency of President Francois "Papa Doc" Duvalier.[2] For brief periods following Duvalier's election to the presidency, her father and his son, Mrs. Noel's half brother, were arrested and jailed, as was the half-brother's wife. During this period, Mrs. Noel was working as a secretary. Fearful that a co-worker was going to inform the government of her family connections, Mrs. Noel and her husband fled to French Guiana. After a year there, her husband decided to return to Haiti. Upon her husband's return to Haiti his passport was confiscated, but he was not persecuted. Mrs. Noel, however, feared for her return and so went to Georgetown, British Guiana, and received a visa to come to the United States for pleasure. Mrs. Noel's four children are in Haiti.

The Service's trial attorney offered into evidence the Department of State's advisory opinion, originally sent to the District Director. Mrs. Noel made no objection.

On January 10, 1975, the IJ rendered a decision denying Mrs. Noel's application for withholding of deportation. He noted that "Respondent has not presented any evidence other than her own testimony in support of her claim." These claims could not be credited, he wrote, without ignoring that Magloire had been out of power for seven years when the arrests of Mrs. Noel's father and half-brother had taken place, and that

no arrest or detention was visited on her. It would be "difficult to understand" how her employment would have escaped the notice of the government if they had any interest in her or her political views; moreover, while the incident involving the fellow employee had taken place in 1967, Mrs. Noel did not leave the island until 1968.

On May 5, 1975, the Board of Immigration Appeals dismissed the appeal from the IJ's ruling. Neither opinion mentioned the State Department letter. Since the filing of the present petition on June 3, 1975, Mrs. Noel has enjoyed a stay of deportation.

### Discussion

■ The prime subject of complaint by the petitioners in both cases is the admission of the letters from the Department of State in response to the District Director's requests for recommendations concerning their applications for asylum. Although we could dispose of these cases on the basis of lack of objection before the IJ or the Board of Immigration Appeals, the problem is a recurring one, and we think a statement of our views may be useful.

■ The source of the problem lies in the co-existence of § 243(h) and the regulation, 8 C.F.R. Part 108, and the Operations Instructions thereunder, dealing with the grant of political asylum. Under the informal procedure set up by the regulation and the Operations Instruction, aliens like petitioners may apply for asylum to the district director having jurisdiction over their place of residence. Unless in the opinion of the district director the application is "clearly meritorious or clearly lacking in substance," he shall request the views of the Department of State, acting through the ORM, before making his decision. Requests for asylum may be made before, during or even after a deportation hearing. Such referrals to the Department of State for a recommendation with respect to asylum create no due process problem since, apart from other reasons, resort to § 243(h) remains open, and that provision makes a hearing procedure available, see p. 1060 *infra. Opp Cot-*

2. Duvalier died in 1971 and was succeeded by his son.

*ton Mills, Inc. v. Administrator,* 312 U.S. 126, 152–53, 61 S.Ct. 524, 535–536, 85 L.Ed. 624, 639–640 (1941).

The problem of fair procedure arises when the INS offers the ORM's asylum recommendation in response to an application for § 243(h) withholding, as apparently it quite regularly does. Such applications are heard under the procedures set forth by 8 C.F.R. § 242.17(c). After setting up a procedure whereby a deportable alien may designate a country for his deportation, this directs the special inquiry officer to specify the country or countries to which deportation will be directed if the alien's designation proves abortive or he fails to make one and to advise the alien of his right to apply under § 243(h) for temporary withholding of deportation to the countries so specified. The regulation then provides that

The application shall consist of respondent's statement setting forth the reasons in support of his request. The respondent shall be examined under oath on his application and may present such pertinent evidence or information as he has readily available.

and that

The trial attorney may also present evidence or information for the record, and he may submit information not of record to be considered by the special inquiry officer provided that the special inquiry officer or the Board has determined that such information is relevant and is classified . . . as requiring protection from unauthorized disclosure in the interest of national security. . . . Whenever he believes he can do so consistently with safeguarding both the information and its source, the special inquiry officer should state more specifically the general nature of the information in order that the respondent may have an opportunity to offer opposing evidence.

However, the regulation neither makes an explicit provision for State Department participation, as the asylum decision procedures do, 8 C.F.R. § 108, nor expressly affords an alien the procedures provided for

the deportation hearing proper by § 242(b) which directs the Attorney General to prescribe regulations that will insure the alien "a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1252(b)(3).

In *Kordic v. Esperdy,* 386 F.2d 232, 238–39 (1967), *cert. denied,* 392 U.S. 935, 88 S.Ct. 2301, 20 L.Ed.2d 1393 (1968), this court seemingly accepted an argument, based on *Wong Wing Hang v. INS,* 360 F.2d 715, 717 (2 Cir. 1966), that the determination whether or not persecution, within the meaning of § 243(h), would actually occur in the event of deportation was a finding of fact—distinct from the exercise of administrative discretion to stay deportation—and "must pass the substantial evidence test." It would seem to follow that the procedure prescribed by § 242(b), quoted in part above, governs at least the fact-finding portion of the § 243(h) inquiry, subject to any withholding of information necessary on national security grounds.

Moreover, since the application for § 243(h) relief can be made only during the hearing, 8 C.F.R. § 242.17(d)—indeed the post-1961 regulations treat the various discretionary decisions by the Attorney General as matters "ancillary" to the deportation proceedings proper, 25 F.R. 12112—we may take it that, at least as concerns the fact-finding process upon which the discretionary decision in part depends, see *Kordic, supra,* 386 F.2d at 239, and *Wong Wing Hang v. INS, supra,* 360 F.2d at 717, and excluding material deemed confidential for reasons of national security, the § 243(h) inquiry constitutes a hearing, albeit a hearing within a hearing. As the Supreme Court assumed in the context of § 244(a) discretionary relief, the statute implicitly requires, save for security matters, a "hearing on an open record as to the specified statutory prerequisites to favorable action," *Jay v. Boyd,* 351 U.S. 345, 353, 76 S.Ct. 919, 924, 100 L.Ed. 1242 (1956).[3]

---

**3.** We do not disturb the holdings of *U. S. ex rel. Dolenz v. Shaughnessy,* 206 F.2d 392, 395 (2 Cir. 1953), and *Vardjan v. Esperdy,* 197 F.Supp. 931 (S.D.N.Y.1961), *aff'd per curiam,* 303 F.2d

It is in the context of a "hearing," then, that the admissibility of the ORM letters must be considered.

The admissibility of ORM recommendations in a § 243(h) proceeding has been considered in a series of cases in the Ninth Circuit. Admissibility was sustained in *Asghari v. INS,* 396 F.2d 391 (1968), on the basis that the "advice came from a knowledgeable and competent source," citing *Hosseinmardi v. INS,* 391 F.2d 914 (9 Cir. 1968). However, the panel opinion in *Hosseinmardi* was withdrawn and did not resurface in the bound volume of the Federal 2d reports until the denial of rehearing on January 29, 1969, 405 F.2d 25. Meanwhile the Ninth Circuit had decided *Kasravi v. INS,* 400 F.2d 675 (July 23, 1968), where, although denying the petition, apparently on the ground that orders denying withholding of deportation under § 243(h) could be reviewed only for an abuse of discretion, the court said of an ORM letter:

> Not only does this letter lack persuasiveness, but the competency of State Department letters in matters of this kind is highly questionable. . . . Such letters from the State Department do not carry the guarantees of reliability which the law demands of admissible evidence. A frank, but official, discussion of the political shortcomings of a friendly nation

is not always compatible with the high duty to maintain advantageous diplomatic relations with nations throughout the world. The traditional foundation required of expert testimony is lacking; nor can official position be said to supply an acceptable substitute. No hearing officer or court has the means to know the diplomatic necessities of the moment, in the light of which the statements must be weighed.

In the decision on rehearing in *Hosseinmardi,* 405 F.2d 25, 28, the majority said, after taking note of the statement in *Kasravi* just quoted:

> The generalities regarding conditions in [the foreign state] which appear in the letter were severely challenged by petitioner's expert witnesses. It might well have been improper had the Board given substantial weight to those generalities without corroboration or further inquiry.

The judge who had authored the original opinion reiterated his belief in the admissibility of the letter, citing the Ninth Circuit's earlier decision in *Namkung v. Boyd,* 226 F.2d 385 (1955), which had upheld the admissibility of a letter from a foreign Consul General, indeed a diplomat from the very country to which the alien was resisting deportation.

279 (2 Cir. 1962), that the requirements for a full and fair hearing generally applicable to the deportation process do not apply to the discretionary withholding procedure of § 243(h) *in toto.* Prior to January 22, 1962, § 243(h) motions could only be made after the deportation hearing and the hearing officer was empowered merely to make recommendations to the regional director; this bifurcation was perhaps in part responsible for the view, expressed in *Dolenz* and *Vardjan,* that a hearing requirement is less applicable to the § 243(h) phase of the process, see Davis, The Requirement of a Trial-type Hearing, 70 Harv.L.Rev. 193, 252–55 (1956). While the effect of requiring the § 243(h) motion to be made during the deportation hearing and of authorizing the hearing officer to resolve the motion is to afford the applicant an opportunity for a hearing, we recognize the special quality of that hearing, specifically the availability, in the circumstances defined by 8 C.F.R. § 242.17(c), of nonrecord material for consideration by the hearing offi-

cer. The courts that have held orders denying relief under § 243(h) to be subject to limited review with respect to the merits, including our own decision in *Kordic, supra; Hamad v. INS,* 137 U.S.App.D.C. 77, 420 F.2d 645 (1969); and *Khalil v. District Director,* 457 F.2d 1276, 1278 n.4 (9 Cir. 1972), do not seem to have given much consideration to a question that constituted one of the bases for Judge Swan's view in *Dolenz, supra,* that no such review was available. That is how, if the Attorney General or his delegate has considered confidential extrarecord material with respect to conditions in a foreign country, a court of appeals, which is not privy to the undisclosed information, can engage in meaningful review even with respect to the question whether the alien would be subject to persecution. Cf. *Chicago & Southern Airlines v. Waterman S. S. Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568, 576 (1948). Perhaps the reason is that little recourse to nonrecord materials has been had.

Recently the Fifth Circuit has been confronted with the same problem—with the added fillip that the ORM letter was shown to be in error in its statement of petitioners' claims and consequently to have been unresponsive to them. *Paul v. INS,* 5 Cir., 521 F.2d 194 (1975). In affirming the denial of withholding of deportation, the majority said that petitioners' arguments regarding the ORM communication "might be persuasive if it appeared from the record that the telegram influenced the decision of the Immigration Judge and the Board of Immigration Appeals, but such is not the case," 521 F.2d at 200. Judge Godbold, dissenting, disagreed with the latter conclusion, 521 F.2d at 204–05.

 We think solution of the problem lies in Professor Kenneth Culp Davis' famous distinction between adjudicative and legislative facts.[4] The attitude of the country of prospective deportation toward various types of former residents is a question of legislative fact, on which the safeguards of confrontation and cross-examination are not required and on which the IJ needs all the help he can get. He cannot expect much from the applicants who, as Judge Waterman wrote in *Sovich v. Esperdy,* 319 F.2d 21, 29 (2 Cir. 1963), are often "unlettered persons who have been away from their native countries for many years" and "typically have available to them no better methods for ascertaining current political conditions abroad than does the average citizen." The worse complexion the alien puts on his previous conduct or the character of the present regime, the greater will be the likelihood that he may indeed be persecuted if his § 243(h) application fails; hence he might logically be under some compulsion to understate his case—although perusal of these and other petitions scarcely indicates such a tendency. Also, the greater the likelihood of persecution in the foreign country, the less will be the possibility of obtaining information from relatives or friends who are still there. Only rarely will an applicant be able to locate and enlist the services of an expert on conditions in the foreign country, as was done in *Berdo v. INS,* 432 F.2d 824 (6 Cir. 1970). Counsel for the INS may not be much better off. The obvious source of information on general conditions in the foreign country is the Department of State which has diplomatic and consular representatives throughout the world. While there is undoubted truth in the observation in *Kasravi, supra,* 400 F.2d at 677 n.1, as to there being some likelihood of the Department's tempering the wind in comments concerning internal affairs of a foreign nation, it is usually the best available source of information and the difficulty could be mitigated by not spreading its views on the record, as C.F.R. § 242.17(c) permits. We therefore see no bar to the admissibility of statements of the Department of State or its officials abroad which inform the IJ and the Board of Immigration Appeals of the extent to which the nation of prospective deportation engages in "persecution on account of race, religion, or political opinion" of the class of persons to whom an applicant under § 243(h) claims to belong, and reveal, so far as feasible, the basis for the views expressed, but do not attempt to apply this knowledge to the particular case, as the ORM does in making recommendations with respect to requests for political asylum.[5]

The difficulty with introducing ORM letters into hearings under § 243(h) is that

---

4. "Adjudicative facts are the facts about the parties and their activities, businesses, and properties . . . . Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." Administrative Law Treatise § 7.02 at 413 (1958).

5. Although we disapprove of the receipt in evidence of opinions of the Department of State with respect to the probable persecution of the particular alien (except, of course, when he consents), we think it would be helpful if the INS would furnish the Department with the names of aliens whose § 243(h) applications have been denied and if the Department would endeavor to follow up on what occurred. This would help to make the Department's analyses of conditions in various countries current and realistic.

they do both too little and too much. The ones in these cases and in others that we have seen give little or nothing in the way of useful information about conditions in the foreign country. What they do is to recommend how the district director should decide the particular petitioner's request for asylum. When these letters are introduced into the § 243(h) inquiry, they present ORM's conclusion as to an adjudicative fact, based, in the present examples, solely on the alien's own statements and phrased in the very language of the § 243(h) standard. Adjudication in the withholding process is, however, the task of the IJ and the Board of Immigration Appeals. Particularly in light of the difficulties confronting the alien in proving his case, there is a risk that such communications will carry a weight they do not deserve. It should not be difficult for the INS and the Department of State to conform their practices in the future to the views here expressed.

 On the other hand we are unwilling to announce a rule that would call for reversal of all denials of § 243(h) applications where an ORM recommendation has been received at the hearing. Before we would reverse because of the receipt of ORM recommendations, a petitioner must show some likelihood that it influenced the result. Here, in sharp contrast to *Paul v. INS, supra,* 521 F.2d 194, the petitioners' cases were exceedingly weak, see *Khalil v. District Director,* 457 F.2d 1276 (9 Cir. 1972). The Zamoras' case rested mainly on their having participated in 1969 or 1970 in anti-government street demonstrations for which other participants had been arrested. But the Zamoras had not been arrested and had been allowed freely to leave the Philippines. They relied also on the marriage of a cousin to the nephew of an imprisoned Philippine Senator. If the nephew and the cousin had not been persecuted—and such persecution was not alleged—it is far-fetched to think the Zamoras would be. Whatever persuasiveness Mrs. Noel's case might have had shortly after Duvalier's accession to the presidency of Haiti in 1957, it would be hard to believe that the present government would persecute her on the sole

ground—and nothing else was alleged—that her step-mother was the sister and that her father had been an officer in the army of a president whose regime ended nearly twenty years ago. The IJ and the Board of Immigration Appeals thus had ample grounds for rejecting these petitions quite apart from the ORM's recommendations. Finally no reliance is placed on the ORM letter in either decision in Mrs. Noel's case and such reliance was expressly disclaimed by the IJ (although not by the Board of Immigration Appeals) in deciding the Zamoras' application.

The petitions to review are denied.