MATTER OF JANUS AND JANEK

In Deportation Proceedings

A-14813095-6

A-14805412

*Decided by Board July 25, 1968*

(1) In the exercise of discretion, adjustment of status under section 245, Immigration and Nationality Act, as amended, is granted an alien whose nonimmigrant entry was not intended to bypass the normal visa-issuing process; who has close family here; who is eligible for visa issuance and who is unwilling to return to his native Czechoslovakia where he has been convicted, in absentia, of defection from the republic, sentenced to imprisonment, and his property confiscated.

(2) Applications for withholding of deportation under section 243(h) of the Act alleging fear of persecution for political opinion are granted two natives and citizens of Czechoslovakia who, although members of the Communist Party at time of their nonimmigrant entry, by their uncontradicted testimony express their long-standing opposition to the political regime in Czechoslovakia; who defected at the first opportunity, one repudiating his entrusted mission of propagandizing for the Communist government in this country, the other overtly making his criticism of conditions in Czechosolvakia to agencies which could disseminate it widely and effectively; and who have both been convicted, in absentia, of defection from the republic and sentenced to imprisonment.

(3) The legal posture of an applicant for conditional entry under section 203(a) (7) is not that of an applicant for withholding of deportation under section 243(h) of the Act and specific standards of conduct cannot be set which will guarantee, without more, inclusion in or exclusion from eligibility for either benefit sought. An application under either section 203(a) (7) or 243(h) must be decided individually, on all its facts.

CHARGES:

Order: (All)—Act of 1952—Section 241(a) (2) [8 U.S.C. 1251(a) (2)]— Nonimmigrant visitors, remained longer.

<table>
<tr><td>ON BEHALF OF RESPONDENTS:<br>Charles Sternberg, Esquire<br>International Rescue Committee<br>386 Park Avenue South<br>New York, New York 10016[1]</td><td>ON BEHALF OF SERVICE:<br>Irving A. Appleman<br>Appellate Trial Attorney</td></tr>
</table>

---

[1] Because of their own activities with refugees and other immigrants, and their interest in the subject matter of this appeal, the following voluntary agencies

This case is before us on appeal from the decision of the special inquiry officer:[2]

Finding all three respondents deportable as charged;

Denying the application of respondent (1) for adjustment under Section 245 upon the ground that he is statutorily ineligible therefor;

Denying the application of respondent (2) for adjustment under Section 245 as a matter of discretion;

Granting voluntary departure to all, with the provision that if they do not depart when and as required, each will be ordered deported, respondents (1) and (2), who made no designation, to Czechoslovakia, respondent (3) to Sweden, the country of designation, with provision that if Sweden does not accept him, that he also be ordered deported to Czechoslovakia;

Denying to all a withholding of deportation to Czechoslovakia under Section 243(h) upon the ground that they have failed to sustain their burden of establishing that they would be persecuted because of race, religion or politics if returned to Czechoslovakia

## I

We deal first with the case of Frantisek Janus, in which our disposition differs from that of the other two cases. Frantisek is a 42-year-old married male alien, native and citizen of Czechoslovakia, whose only entry to the United States was on July 7, 1966, as a nonimmigrant visitor for pleasure; his authorized stay expired on August 31, 1966 and he remained beyond that date without authority. He concedes that he is deportable as charged. At the deportation hearing held on October 26, 1966, he learned that it was possible to apply for adjustment to permanent resident status in the United States (see Tr. p. 6J) and the hearing was adjourned to permit him and Jaroslav Janus, who is his brother, to prepare and present such applications, based on petitions for fifth preference quota status to be filed by one of their two American citizen brothers. The petitions were filed and were

joined in a single Brief Amicus Curiae, and requested permission to be present at oral argument: American Fund for Czechoslovak Refugees, Inc.; Church World Service, Inc.; National Council of Churches of Christ, USA; Department of Immigration, United States Catholic Conference; Lutheran Immigration and Refugee Service, Lutheran Council USA; Polish American Immigration and Relief Committee, Inc.; Tolstoy Foundation, Inc.; United HIAS Service, Inc.

[2] There were two sets of hearings held, one for the Janus brothers-together and one for Janek. Reference to transcript pages and exhibits in the Janus file is followed by the letter "J"; for Janek, by the letter "K".

approved in January 1967; then and now ther was immediate quota availability based on the priority date created by the filing of the petitions.

The special inquiry officer, stating that Frantisek's application for adjustment had not been completely processed because of the decision the special inquiry officer had decided to make, assumed Frantisek to be statutorily eligible. The application and the record do not disclose any basis of ineligibility. The special inquiry officer, in considering the discretionary factor, referred to testimony by this respondent that when he applied for his visa he was seriously considering remaining here permanently, a fact which he did not tell the Consul for fear that he would not be able to come to the United States. It was respondent's further testimony that although he then wished to stay here permanently, he did not make the final decision to do so until after his arrival in the United States. On this basis, the special inquiry officer decided that respondent was not a bona fide nonimmigrant at the time of entry, and, citing *Matter of Ortiz-Prieto.* 11 I. & N. Dec. 317, stated that there were no equities in the case which indicated that the results of the application should be other than adverse, as in the cited case.

We do not believe that a denial of adjustment is warranted. Here, as in *Ortiz-Prieto*, a favorable factor is that respondent's entry on a nonimmigrant visa was not made to bypass the normal visa issuing processes. In this case, however, it was the special inquiry officer himself, three and a half months after their entry, who first made the Janus brothers aware that it was possible to apply for adjustment, and that their citizen brothers could file petitions to secure quota preferences for them. Neither this respondent nor his brother began to work in this country until after the deportation proceedings were instituted. Respondent has close family here (his two citizen brothers) ; his wife, who remained in Czechoslovakia, has not made any objection to the application for adjustment. Respondent, who is clearly eligible for visa issuance and has the requisite quota availability, cannot take advantage of these factors anywhere but in the United States. He has no foreign country to which he can go to apply for a visa; he is understandably unwilling to return to Czechoslovakia, where he has been convicted, in absentia, of "Defection from the Republic", sentenced to a year's imprisonment, and has already had all of his property confiscated. Respondent has been working steadily since he took his first job in the United States and has been sending money to Czechoslovakia for the support of his wife and children; he has no criminal record other than the above mentioned conviction.

The total picture justifies a favorable exercise of discretion on Frantisek Janus' behalf, and we will provide for a grant to him of adjustment to permanent resident status, under section 245, in our order at the conclusion of this decision.

## II

Vladimir Janek, who has no family here, and no quota availability, made no application for adjustment. He was a voluntary member of the Communist Party who started doubting its goals in 1957, after the Hungarian Revolution, and who, by 1963, considered himself its enemy and had started thinking about ways to escape from Communist Czechoslovakia. He has asked for political asylum here as a defector.

Jaroslav Janus made application under section 245, on the basis of his brother's petition for fifth preference quota status. On the Form I-485, he showed that he had been a member of the Communist Party in Czechoslovakia from the summer of 1956 to the time of his departure in July 1966. He stated that when he applied for a visitor's visa in Prague, he was specifically asked by the American Consular Officer whether he had ever been a member of the Communist Party, and he denied it because he was afraid that if he told the truth, he would not have been given a visa and would not have been able to come to the United States (Ex. 9B, J, p. 3J). The special inquiry officer, after considering respondent's claim that his Party membership was involuntary, found that it had not been sustained, and that respondent was precluded from establishing eligibility under section 212(a)(28); he also found, using the standards of *Matter of S— and B—C—*, 9 I. & N. Dec. 436, that respondent had made a material misrepresentation in denying membership, and was thus precluded from establishing adjustment eligibility under section 212(a)(19). We accept the special inquiry officer's holding that this respondent is statutorily ineligible for adjustment of status under section 245.

Both of these respondents have applied for withholding of deportation to Czechoslovakia under section 243(h), claiming they would be persecuted for political reasons if they were to return. Each already has awaiting him a prison sentence on a conviction entered against him in absentia under Article 109 of the Criminal Law of Czechoslovakia.[3] Article 109 is entitled: "Defection from the Republic". It covers (1) a person who leaves Czechoslovakia without permission,

---

[3] Jaroslav Janus testified that his wife had advised him she had tried but was unable to get a copy of his conviction from the court, but that his proceedings were the same as his brother's, were held a week or two later, and resulted in the same conviction and sentence. A copy of the conviction of Frantisek Janus is in the file as Exhibit 11J.

(2) a Czechoslovak citizen who remains in a foreign country without permission, and (3) one who organizes either of those acts or leads a group or groups of people across the border, they being without permits to leave the country. Each respondent has been found a defector from the Republic under the second category.

In Jaroslav Janus' case, the court sentenced him to a year's imprisonment and ordered all of his property confiscated. His uncontradicted testimony is that not only were all of his personal effects taken, along with the automobile given jointly to him and his brother Frantisek by their two United States citizen brothers, but half of the property he owned is common with his wife as well (Tr. p. 49J). He and she, among other things, owned a 50% interest in their family home; the government did not sell or confiscate the home, but instead made his wife pay 15,000 crowns for respondent's share. (The special inquiry officer stated, at page 17, of the Janek record, that as of November 1, 1965, the exchange rate for the Czechoslovak crown was $.14 US. Thus, as part of the confiscation Jaroslav's wife paid $2,100 to the Czech Government.) Frantisek Janus was also sentenced to a year's imprisonment and to confiscation of his property. The record of his conviction characterized his crime as harmful to society because, among other things, he had denigrated the good name of the Czechoslovak Republic (Ex. 11J, p. 2). It may be assumed that the same characterization was made of Jaroslav Janus' acts.

Vladimir Janek was sentenced to eight months' imprisonment, with no confiscation of property. The record of conviction shows that Janek's wife testified that after he had advised her by letter that he intended to remain in the United States, he began to write letters in which he expressed homesickness, from which she assumed that he would undoubtedly wish to return to Czechoslovakia (Janek testified that this was a fabrication on his wife's part, Tr. p. 78K). From this, and after a review of his background, the Court believed "that the defendant committed a criminal act obviously at the instigation of some other persons and without a thorough deliberation of his action" (Ex. 3K, bottom of p. 3). The Court then specifically stated that it had set the sentence at the lowest level of the legal schedule so that it would offer the defendant an opportunity to return to Czchoslovakia. Janek and his witnesses all believed that this attempt to get him back was to counteract the harmful effect of his, and other people's defections, but that once he was back he would be subject to considerably harsher treatment.

Both Janek and Jaroslav Janus believe that if they were to return, more would await them than the sentences now in effect. Each was a member of the Communist Party and testified that this fact alone

would make the crimes more serious in the eyes of the government (both witnesses who testified in Janek's case agreed with this view). Once they were actually in the custody of the Czech authorities, there was no telling for how long they would be imprisoned. They claimed, too, that punishment and ostracism would continue even after release from prison, that they would thereafter be relegated to hard labor, perhaps in the mines, and would never again be able to get jobs above the menial level.

Respondent Janek cited additional reason for fearing dire consequences. Shortly after his arrival here, he gave a four-hour interview to the Federal Bureau of Investigation, in which he discussed conditions in Communist Czechoslovakia as they actually were. He was also interviewed on the same subject for Radio Free Europe, and later by the Czech language press in the United States. Exhibits 10K is the front page of one such newspaper, containing the story of his departure and conviction, and setting forth prominently the fact that immediately upon his leaving the Czech tourist group with which he came here, he contacted the newspaper and gave it information about the actual state of affairs in Czechoslovakia. We have little doubt that at least some, if not all, of these facts are known to the Czech Government.

Janek testified that he vocally differed with and criticized communist policy for at least ten years. His first disenchantment was about the Hungarian Revolution. He was then at officers' school, scheduled to become an officer in the army. He stated that he spoke out critically about those events and was dismissed from the school, two or three months before the completion of his course (Tr. p. 72K). He stated that when he first joined the Party, he had believed that it really was working for the good of all, but:

* * * gradually I came to the conclusion that everything the party stands for is illogical and unacceptable for me. Gradually I saw for myself that the words, that the leaders of the Communist State used, when they stated that they were working for the benefit of the people and for the country, were not based on any truth—that they were all lies—and that those leaders were committing crimes against the nation. When I found this out I spoke against it at the meetings of the Party and of the Labor Union about those facts. However, I found out that any position which I took against these facts were completely in vain and to no avail. Moreover, I have been attacked on several occassions and that I was a reactionary and that I was speaking in the spirit of the western ideology. Later I became discriminated against in my work and people who once used to be my friends began to ostracize me. I became so disgusted that from 1963 I refused to take any part in any activity in public. (Tr. p. 13K.)

In a sworn statement made to a Service investigator, Janek named at least five offices he had held in communist organizations before

his cessation of activity in 1963 (Ex. 9K, p. 5). He also said he had been told that he had been denounced by the State Security in the summer of 1964 because he had stated publicly, at a meeting of the employees of the plant where he worked, that the methods by which Khrushchev had been deposed were intolerable (Ex. 9K, 6).

Testifying further about his reasons for becoming anti-Communist, he said it became obvious to him that many crimes had been committed for which the perpetrators had never been brought to justice—many, many people executed and afterwards "rehabilitated", but that nothing had been done about these executions, it was just "as if somebody had shot a rabbit." Since he was in a lower echelon of the Party, he could stand up and speak out against these things, but his criticism was in vain. As he put it: "It was just like throwing peas on the wall, they bounced back and nothing happened" (Tr. p. 73K).

He decided in 1963 that he would have to leave Czechoslovakia. He twice tried to get permission to leave, once to West Germany, and once to Austria, but was refused each time (Tr. p. 15K). It was then that he decided to give up his skilled and well-paying job as a chemical worker (he testified that he had earned 2,800 to 3,000 crowns a month—$392 to $420—a very high income by Czech standards—Tr. p. 17) and to go to work as a miner.

I went there—also the work is extremely difficult and most of the workers there are sent for punishment—I just wanted to disappear from their eyes, meaning the Party. I wanted to disappear from the eyes of the people who knew what my convictions were because at that time I planned already for a year that I would take a trip abroad to the west. Because all travel abroad has to be approved by the communist party and by the worker's committee I would never stand a chance that I could get such approval to travel west. At my new place of work I received approval where they did not know me. (Tr. p. 74K.)

Much of this material about Janek has been disregarded or glossed over by the special inquiry officer, with the statement that Janek was not subjected to persecution while in Czechoslovakia, and that generally speaking overt acts in the United States manifesting opposition to the country of possible deportation do not support an application under section 243(h). It is his further holding that there has been no showing that the conviction in absentia was politically motivated. We feel that these criteria have been taken and used out of context in this case.

While it is true that we have not regarded with favor an applicant whose first indication of opposition to the political regime of the country he left is made after arrival in the United States, that is not what confronts us here. Janek's uncontroverted testimony is that he

872

started expressing opposition in 1957 in Czechoslovakia and was dismissed from the officers' school for it; that he continued to express his dissenting views, although his criticism had no effect except to injure him. The sincerity and strength of his opposition is shown by the fact that his criticism here was not made in private to friends and acquaintances but to agencies which could best put it to use and could disseminate it most widely and effectively. We do not doubt that if he were to return to Czechoslovakia, he would be punished for these acts under Articles 102 (Defamation of the Republic, *etc.*), 103 (Defamation of the President or other public representative, *etc.*), 104 (Defamation of a state belonging to the world Socialist system), 106 (exposure of State secrets—this respondent worked in uranium processing plants and offered to share his knowledge with the United States Government), and 112 (violation of the interests of the Republic abroad) of the Criminal Law, and we believe that under these circumstances such prosecution would in effect be persecution for political opposition. This is a factor to be reckoned with, especially when the acts committed in the United States are not the beginning but the continuation of a year's long course of expression of opposition to the Communist Czech regime.

It cannot be said, across the board, that every statute imposing criminal sanctions for unauthorized travel outside of a particular country must be devoid of political implications. That will depend upon the provisions of the particular statute and the manner in which it is administered. The one under which respondent was convicted is, by its own denomination, aimed at "Defection from the Republic." The act of defection normally has political, rather than criminal, connotations. Also, a conviction that concerns itself with the fact that the defendant comes from a worker's family, that by his failure to return he took advantage of the confidence shown in him, and that he did not act as a good citizen when at the first available opportunity he defected from his native country and remained abroad (Ex. 3K), does not, it appears to us, have travel control as its prime concern.

On evaluation of all the material and testimony presented by Janek and on his behalf, we conclude that he has so strongly shown the likelihood of persecution for his opposition to the political system in Czecholsovakia that it cannot be disregarded. We are mindful, too, of the letter in Janek's file (Ex. 15K) from the State Department to the District Director at New York, received by him on September 12, 1967, in which it is stated:

> On the basis of the information contained in Mr. Janek's file, the Department does not favor his deportation to Czechoslovakia * * *.

We shall grant to Janek the requested withholding of deportation under section 243(h).

873

Returning to the case of Jaroslav Janus, he testified that he had never believed in the tenets of communism and was opposed to the regime from the time of its accession to power in 1948 (see Ex. 9AJ, p. 7); he was the only member of his family to join the Communist Party. His brother Frantisek was approached but refused to join (Ex. 10J, p. 4); his brother Jaromir was so opposed to the regime that he tried to escape from Czechoslovakia illegally in 1955, was arrested and imprisoned 4–5 months (his wife obtained his release from jail by a petition to the President), and since that time has been unable to get a job as anything but a delivery man in a factory, despite the fact that he has been trained in certain skills (Tr. pp. 33–34J). Jaroslav testified that none of his four children is a member of the Party: "I brought them up in a way to be opposed to the Communist Party" (Tr. p. 32J). His own membership in the Party was passive; he held no office (Ex. 9AJ, p. 6) and did not always attend the monthly meetings (Ex. 9AJ, p. 8). He testified that he joined the Party because he felt it was necessary to protect his family's financial security. He had broken his wrist in about 1955 and the bone took more than a year to heal; even at the end of that time, the wrist was inflexible so that he could not work, as he had before, on the assembly line. Although the union provided for a disabled worker to the extent of establishing that he was entitled to 80% of his base salary during illness or injury for a period of up to one year, the worker was nevertheless in financial straits because his salary was normally augmented by overtime pay, and 80% of the base salary was not sufficient compensation. Also, although the union offered some job protection in that the worker after recovery was entitled to get a job in the same plant, it did not have to be on the same level as the prior job (Tr. pp. 36–37J). It was in this situation, after a considerable period of injury and materially lowered income and enough residual disability so that he could not return to any manually skilled job, that Jaroslav Janus was approached by the Party with the promise that if he joined he would get a foreman's job, but that if he did not, he would get a lesser job than he originally had (he believed this might have been on the level of a cleaning man or delivery man—Tr. p. 35J), and he decided to join the Party (Tr. pp. 28J, 35–37J). He makes no claim that he ever publicly denounced the Party or its goals, although he was always opposed to communism, he apparently lived with his membership as a necessary evil, doing no more than he had to to maintain that membership. He testified that he had no difficulty in obtaining his passport to come to the United States because his brothers had visited Czechoslovakia a short while before, and he was requesting the passport to visit them in the United States. He also stated that before

he left, he was visited by a representative of the Secret Police who told him that if he should meet people in the United States, especially immigrants from Czechoslovakia, who criticized the Czechoslovak regime, he (Janus) should explain that the situation had improved very much and should try to change the person's anti-Communist views (Ex. 9AJ, p. 9).

Jaroslav Janus left Czechoslovakia because of his disagreement with the Communist system (Tr. p. 29; p. 13; p. 25J, etc.); he left with the intention of never returning (Ex. 9AJ, p. 6). Nothing in the files indictates anything other than this political motivation for his renunciation of the country where he was born and lived for 47 years. He is genuinely afraid of reprisals by the Czech Government if he should be forced to return, not simply because he has remained away longer than authorized, but because he, a member of the Communist Party in good standing, entrusted with the mission of propagandizing for the Communist government in the United States, showed his true political sentiments by defecting. The punishment imposed upon him by the Czech court under Article 109/2, including not only the sentence to imprisonment but, on his very first offense of any kind, the confiscation of all of his property; the severity with which that confiscation was carried out, including the enforced contribution by his wife of $2,100 to cover the value of his interest in their home; the concern, in the record of his brother's conviction, with the defection from the Republic, and with the denigration of the good name of Czechoslovak Republic (Ex. 11J); all of these factors persuade us that what would await Jaroslav Janek upon his return to Czechoslovakia would not be punishment for violation of an ordinary criminal statute (the prosecution has already taken place), but persecution for the political offense he has committed against the State. We hold that respondent has satisfied the requirements of section 243(h), as amended by the Act of October 3, 1965, and will grant to him also a withholding of deportation.

### III

Counsel and the voluntary agencies that have interested themselves in these cases contend that the special inquiry officers and the Board continue to apply a far too stringent standard and impose a far too heavy burden on the alien in these cases, ignoring the change made in the law by the 1965 amendment, and ignoring, too, the equating by that act of the standard necessary for a section 243(h) withholding with the standard for establishing eligibility as a conditional entrant under section 203(a)(7). They contend that the special inquiry officers and the Board do not recognize certain truths; i.e., that a man may be fleeing from a country even though he does not cross its borders

clandestinely but exits with proper documentation; that statutes restricting all travel outside of a country and punishing violations with imprisonment or other criminal sanctions, are inherently political in character and not analogous to provisions such as section 215, Immigration and Nationality Act; that any person, therefore, who leaves an Iron Curtain country and stays out of it longer than authorized, faces political persecution on his return, and should not be deported back behind the Iron Curtain, *etc.*

The Board has recognized the changes made in section 243(h) by the 1965 amendment and has not only shaped its own decisions to accord to the changed standards but has often granted reopening and remanded cases so that an application for a stay heard under the older and more stringest standard can be considered under the new. Special inquiry officers have themselves reopened proceedings for the same purpose. The Board recognizes, too, that flight may be made with legal documentation, and has not restricted its rulings on 243(h) eligibility to persons who climbed under fences or swam rivers at night. We are not persuaded, however, that an applicant for conditional entry under section 203(a)(7) is in the same legal posture as an applicant for a withholding of deportation under section 243(h). Nor do we believe that specific standards of conduct can be set which will guarantee, without more, inclusion in or exclusion from eligibility for the benefit being sought. Both under section 203(a)(7) and section 243(h) cases must be decided individually, on all of their facts; the performance of a particular act or the following of a specified course of conduct are no more than guidelines for arriving at a result on the basis of an entire record. We are not convinced that every travel restriction imposed by an Iron Curtain country and punished, in the breach, by imprisonment, is political persecution; or that every person who leaves such a country and subjects himself to the penalties provided under those laws by remaining outside of his country for longer than permitted is a bona fide refugee, or a person who will be subject to persecution on his return because of his political opinion. A person whose departure from an Iron Curtain country is devoid of political motivation, or whose decision not to return is unrelated to the politics of that country (*e.g.*, the person who finds better economic opportunity here, or enters into a marital relationship with a resident alien or United States citizen) is not entitled to a section 243(h) stay solely on the basis that he may face criminal prosecution for overstay. Nor is a person who has not expressed opposition to the political regime before departure automatically excluded from relief, if he can show that his departure was politically motivated and that any consequences he faces on return are political in nature. Each case, as we have said

876

before, must be considered on all of its facts, each factor given its proper weight. We are aware of the inherent nature and intended function of the 243(h) stay provisions, and have shaped our decisions accordingly.

## IV

**ORDER:** It is ordered that the decision of the special inquiry officer heretofore entered be and the same is hereby set aside and that the following order is entered in lieu thereof:

**ORDER:** Conditioned upon the usual processing, including an investigation by the Immigration Service and provided nothing adverse to the respondent is developed in such processing and investigation, it is ordered that respondent Frantisek Janus is granted adjustment to permanent resident status under the provisions of section 245 of the Immigration and Nationality Act; and

*It is further ordered* that respondent Jaroslav Janus is denied adjustment of status under section 245 upon the ground that he is statutorily ineligible therefor; and

*It is further ordered* that respondent Jaroslav Janus be granted voluntary departure from the United States, without expense to the Government, within such time and under such conditions as may be set therefor; and

*It is further ordered* that if respondent Jaroslav Janus should fail to depart when and as required, the privilege of voluntary departure shall be withdrawn without further notice or proceedings, and the following order shall thereupon become immediately effective; respondent Jaroslav Janus shall be deported from the United States to Czechoslovakia upon the charge contained in the order to show cause; and

*It is further ordered* that respondent Vladimir Janek be granted voluntary departure from the United States, without expense to the Government, within such time and under such conditions as may be set therefore; and

*It is further ordered* that if respondent Vladimir Janek should fail to depart when and as required, the privilege of voluntary departure shall be withdrawn without further notice or proceedings, and the following order shall thereupon become immediately effective; respondent Vladimir Janek shall be deported from the United States to Sweden upon the charge contained in the order to show cause; provided, however, that if Sweden advises the Attorney General that it is unwilling to accept respondent Janek into its territory, or fails to advise the Attorney General within three months following original inquiry

whether it will or will not accept respondent into its territory, that respondent shall be deported to Czechoslovakia; and

*It is further ordered* that the deportation of respondents Jaroslav Janus and Vladimir Janek to Czechoslovakia be withheld, pursuant to the provisions of section 243(h) of the Immigration and Nationality Act, for such period and under such conditions as the Attorney General may deem appropriate.