**Raymond CORIOLAN and Willy Bonannee, Petitioners,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 76–2990.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1977.

Donald I. Bierman, Donald L. Ferguson, Miami, Fla., for petitioners.

Philip Wilens, Chief, Govt. Reg. and Labor Section, James P. Morris, Rex L. Young, Attys., Crim. Div., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, WISDOM and COLEMAN, Circuit Judges.

TUTTLE, Circuit Judge:

Raymond Coriolan and Willy Bonannee are Haitian nationals who concededly are deportable from this country.[1] Like many of their compatriots, however, they contend that they will face political persecution on their return to Haiti. If their claims are correct, both sentiments of mercy and statutory provisions would block their deportation. The Immigration and Naturalization Service has concluded that deportation should proceed. We, however, conclude that the INS has thus far failed to adequately evaluate the aliens' claims, and we remand for further proceedings in light of this opinion.

## I. THE PROCEEDINGS BEFORE THE AGENCY

Petitioners' deportation hearing convened on July 13, 1975. The petitioners stipulated to their deportability, and applied for political asylum, a form of relief from deportation which is granted or denied by INS district directors. The district director denied their requests. The aliens then sought relief under Section 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1253(h) (1970), which permits the Attorney General[2] to "withhold deportation" as long as necessary if the alien would be subject to political persecution when deported. This too was denied.[3]

In the course of these proceedings, the aliens had an opportunity to present evidence on their behalf. They offered only their own statements. In Coriolan's case, his statements were sharply self-contradictory, though none painted a rosy picture. In a sworn request for asylum, he stated that secret police (presumably the Tonton Macoutes) suspected him of being a Communist, because he had been seen talking to another Communist, one Louis Pierre. Pierre subsequently was jailed and disappeared. The secret police, Coriolan stated, came to Coriolan's house to arrest him. Coriolan also averred that it was the policy of the Haitian government to persecute returning exiles who fled the country illegally.

On the day he filed this request for asylum, Coriolan was interviewed by an INS investigator. He reported that he had never been suspected of being a Communist, and that police had never come to his house to arrest him. Though he twice said he had left Haiti out of fear of the Tonton Macoutes—and contended that "In Haiti one doesn't have to do anything, they can just look at you and—ah—you scared." During questioning he ultimately said he had come to the United States to work but that he also had "small problems" with the police. He did assert, however, that he was acquainted with Pierre, who was about to be arrested. Pierre was "a problem with police," though not, Coriolan now said, a Communist. Coriolan also for the first time described the fate of his mother's cousin, who some years before had fallen afoul of the Tonton Macoutes when he refused to give them a piece of cloth. At the final deportation hearing, Coriolan reiterated this allegation of his relative's murder. And on this occasion, as in his written request, he declared that he feared jail or death on his return, apparently at least in part because of his illegal departure.

Bonannee's case proceeded at the same time. In his request for asylum, Bonannee stated that his father, whose first name was Belizaire,[4] had been suspected of involvement in an anti-Duvalier movement in 1971, and had had to flee to Cuba. His father's brother was less lucky: he had been ap-

---

1. Each man surreptitiously entered the country by boat, at or near Miami, during 1974 (though not on the same day). Their entries rendered them deportable under 8 U.S.C. § 1251(a)(2).

2. This responsibility is now carried by immigration judges, whose decisions in turn are reviewable by the Board of Immigration Appeals.

3. The points raised on appeal attack aspects of both the Section 243(h) decision and the refusal of political asylum. In light of our disposition of the case, we do not reach any questions concerning the asylum request.

4. Bonannee explained that he adopted his mother's last name (Bonannee) to avoid detection by the Tontons.

prehended and never heard from again in 1973. Bonannee himself had been arrested in 1974 or December 1973, and held until February 1974. He declared, "The Ton Tons said I was the same breed as my father. . . . The change [sic] was speaking against the government. I don't know reason for release." Bonannee also, like Coriolan, feared persecution for his illegal departure, and he expected to be jailed or shot if he returned to Haiti. Bonannee's claims remained essentially the same in his oral interview. He also supplemented his written request in some respects. For example, he attributed his arrest in 1973, two years after the incident involving his father, to his "becoming a Major—an Adult" (though he said he was born in 1941). He also testified that after his release, which apparently was part of an amnesty, he went into hiding for six months to avoid re-arrest and then came to the United States.

Subsequently, however, the INS received from the Department of State a letter which addressed Bonannee's claims.[5] This letter acknowledged that his claim "appeared to have some substance." But the Department of State reported that the incident to which Bonannee attributed his father's political troubles would actually have taken place in the 1950's, and the Department declined to believe that this incident had recently led to his father's arrest. Ultimately, at the final deportation hearing, Bonannee confirmed that the incident took place in 1956, and testified that his father's flight to Cuba also occurred in that year. Bonannee went on to describe the events leading to his own arrest. He had a fight with a militiaman at a dance, and the militiaman recognized him as part of the family which took Duvalier money (apparently this was the father's offense) and arrested him.

Earlier in the hearing, Bonannee also testified that his "wife" (in Haitian parlance, perhaps simply a woman with whom he was living) was in jail for one month after he left.

The Immigration judge denied the petitioners' requests, in an opinion which we will consider in detail shortly. Our analysis, however, must begin with a discussion of the statute—and the treaty—which create the framework for evaluation of persecution claims.

## II. THE GOVERNING LAW

The law regulating persecution claims, although humane in concept, is not generous. The wording of the basic statutory provision, Section 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1253(h) (1970), emphasizes the discretionary nature of the decision to stay deportation because of the risk of persecution:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason."[6]

■ This broad grant of discretion no doubt rested on both the political sentiments prevailing in the 1950's and on the more permanent recognition of Congress' vast power in the field of immigration. The sweep of this grant of discretion, however, must now be measured in light of the United Nations Protocol Relating to the Status of Refugees, to which the United States adhered in 1968. The Protocol incorporated provisions of the 1951 United Nations Convention Relating to the Status of

---

5. INS regulations, 8 C.F.R. § 108.2 (1977) require the District Director to seek the opinion of the State Department whenever he denies a request for asylum as "clearly lacking in substance." The District Director wrote a letter to this effect, referring to the claims of Bonannee, Coriolan and numerous others, on December 22, 1975. The State Department took until April 12, 1976 to respond.

6. Other sections of the immigration laws, not involved in the present case, can provide similar relief. See 8 U.S.C. § 1153(a)(7) (1970) ("conditional entry" or "adjustment of status" for aliens fleeing Communist-dominated or Middle Eastern states); 8 U.S.C. § 1182(d)(5) (1970) ("parole" of aliens into the United States "for emergent reasons or for reasons deemed strictly in the public interest").

Refugees, including Article 33, which requires that:

"1. No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

This Court has not yet decided whether the Protocol restricts the Attorney General's discretion to refuse to stay deportation when he has determined that an alien would face persecution if deported. *See Pierre v. United States,* 547 F.2d 1281, 1289 (5th Cir. 1977). But the Board of Immigration Appeals has declared that it knows of no case in which relief under § 1253(h) has been denied when the alien had established the clear probability of persecution. *Matter of Dunar,* Interim Decision # 2192 at 322 (April 17, 1973).[7] The Immigration and Naturalization Service's brief in *Dunar* declared that "If such a contingency were to arise, it is inconceivable that it could arise in anything other than the context permitted under paragraph 2 of Article 33, namely, national security or danger to the community." *Id.* at 322 n.20.

7. *But cf. Matter of Liao,* 11 I & N. Dec. 113 (1965) in which one basis for denial of relief was the view that this statute does not require a finding as to the likelihood or unlikelihood of persecution. *Dunar* regards as dictum a related point in *Liao,* an "intimation . . . that section 243(h) withholding could be denied in the exercise of discretion on the basis of factors other than those related to the persecution claim." *Dunar, supra* at 323 n.22.

8. In faulting the aliens for failing to "show a well-founded fear" of persecution, the Board was utilizing the standard of the United Nation's Protocol. The Board in *Matter of Dunar,*

We do not suggest that the Protocol profoundly alters American refugee law. We do believe that our adherence to the Protocol reflects or even augments the seriousness of this country's commitment to humanitarian concerns, even in this stern field of law. It may be appropriate to add that the foreign policy of the United States has recently become more dramatically focused in the protection of human rights around the world.

## III. THE INS DECISION

Of course, these broad concerns do not compel an over-credulous acceptance of an alien's claims, nor sanction judicial interference with the proper exercise of discretion by the INS. With these principles in mind we turn to the INS' treatment of petitioners' contentions. The petitioners' claims were first considered by an immigration judge; his refusal to stay deportation was affirmed by the Board of Immigration Appeals. The Board's decision declared only that the aliens "had failed to show a well-founded fear that their lives or freedom would be threatened in Haiti on account of their race, religion, nationality, membership in a particular social group or political opinion."[8] This conclusion obviously gives us no indication of whether it rests upon a credibility evaluation, a decision that the petitioners' testimony—even if credited—reveals no reason to fear persecution, or a construction of law which excludes the penalties petitioners fear from the ambit of the term "persecution."

Int. Dec. # 2192,April 17, 1973) considered the consonance of this standard with the formulation more prevalent before, which required the alien to show a "clear probability of persecution." The Board concluded in *Dunar* that Article 33 of this Protocol effected no substantial changes in the burden of proof under section 243(h), *id.* at 323. But its discussion in *Dunar,* and its subsequent use of the Protocol's terminology in our case and in at least one other proceeding, *Matter of Francois,* Int. Dec. # 2458, at 7 (Dec. 15, 1975), suggest at least a slight diminution in the alien's burden of proof before the Board.

If this were the only indication of the agency's reasoning, surely we would be justified in remanding for an elucidation of the actual rationale. Fortunately, we are not without recourse, for the immigration judge who first considered petitioner's case wrote a substantial opinion setting out his grounds for decision. It seems appropriate to consider whether his reasoning can support the result both he and the Board reached.

The critical portion of his opinion determined that:

"Respondents never served in the Armed Forces of Haiti, nor were they ever employed by the Haitian Government in any capacity. With the exception of Bonannee, they have never been arrested or in any trouble with the law enforcement officials in that country and there is no evidence that they ever belonged to any political organizations or were politically involved in any manner whatsoever in their country. Bonannee has not established his arrest was politically motivated. The evidence of record which consist entirely of the testimony and statements of the respondents, fails to establish that their political opinions differ from those of the vast majority of citizens who reside in Haiti. Respondents' immediate families reside there unmolested. There is no evidence the respondents, with the possible exception of Bonannee, were ever harassed, molested or troubled by the Haitian authorities before they left that country. They claim to have left their country illegally and would now be persecuted for that reason if they re-

turned there. Illegal departure might possibly result in prosecution. Prosecution cannot be considered, under such circumstances, persecution because of one's political opinions.

After careful consideration of all the evidence of record, it is concluded the respondents have failed to show a well-founded fear that their lives or freedom would be threatened in Haiti on account of their race, religion, nationality, membership in a particular social group or political opinion; *Matter of Dunar*, Int. Dec. 2192 (BIA 1973). Therefore, they have failed to establish statutory eligibility for withholding their deportation to Haiti and the facts in the case do not warrant a grant of the relief requested as a matter of administrative discretion. Their application will be denied."

## A. *Findings of Fact*

■ Perhaps the most straightforward task is to examine the immigration judge's evaluation of the evidence before him. It is clear that an evaluation of the agency's treatment of the evidence is a part of review of discretionary agency action. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). In practice, at least, some review of the facts appears to be common even in section 243(h) cases, *see* Note, Judicial Review of Administrative Stays of Deportation: Section 243(h) of the Immigration and Nationality Act of 1952, 1976 Washington U.L.Q. 59, 93 (1976),[9] [hereinafter Note, Judicial Review].

**9.** At least two Courts of Appeals have held that findings of fact by the immigration authorities should be reviewed under the substantial evidence standard. *Hamad v. INS*, 137 U.S.App. D.C. 77, 420 F.2d 645, 646 (1969); *United States ex rel. Kordic v. Esperdy*, 386 F.2d 232, 239 (2d Cir. 1967). *Cf. Foti v. INS*, 375 U.S. 217, 228–29 n.15, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). The authors of a leading treatise on immigration law consider this approach mistaken, and would treat the entire decision to stay or not to stay deportation as a discretionary one, reviewable for abuse of discretion only. C. Gordon & H. Rosenfield, 2 Immigration Law & Procedure § 8.17b at 8–116 (Supp.

October 1976). The INS agrees. *Matter of Dunar*, Int. Dec. # 2192, at 322–23 (April 17, 1973).

The position of our court on this question is cloudy. *Compare Henry v. INS*, Nos. 76–3994, 76–3829, 552 F.2d 130 (5th Cir. 1977) (arbitrary or capricious exercise of discretion) *with Tuan v. INS*, 531 F.2d 1337 (5th Cir. 1976) (applying substantial evidence test in review of denial of another form of discretionary relief).

We need not resolve this ambiguity here. It is enough to recognize that judicial review of INS decisions on persecution claims is deferential, and at the same time to remember that this review ought not to be altogether perfunctory.

The opinion of the immigration judge reflects a view of the facts significantly different from that now urged by Coriolan and Bonannee. His conclusions may well be sustainable under any standard of review. But it is difficult at times for us to discern the basis on which the immigration judge proceeded. The Supreme Court has made clear, to be sure, that it "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned", *Bowman Transportation, Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). But it is also a familiar principle of administrative law that a reviewing court will not supply a reasoned basis for agency action that the agency itself did not articulate. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 66 S.Ct. 1025, 90 L.Ed. 1606 (1947).

This problem is much less acute in Coriolan's case than in Bonannee's, but it is not altogether absent even in the former. The most troublesome point is the judge's conclusion that Coriolan had never been arrested or been in any trouble with Haitian law enforcement officials. Surprisingly, the judge asserted that there was no evidence to the contrary, despite Coriolan's sworn declaration that police had come to his house to arrest him because he had been seen with a Communist. But Coriolan's contradictory testimony certainly provided substantial evidence that much of this first statement was false. Hence, it is probably appropriate to read the immigration judge's opinion as discounting rather than failing to take note of Coriolan's claim.[10]

The judge's treatment of Bonannee's claim is more ambiguous. To be sure, his credibility was subject to attack. But the immigration judge did not actually find Bonannee's testimony unbelievable. In particular, at one point the judge appeared unconvinced that Bonannee actually was arrested at all; at another point in the same paragraph the judge wrote that "Bonannee has not established his arrest was politically motivated." Perhaps the immigration judge felt that Bonannee's original—and false—assertion that his father's political troubles had occurred in 1971, rather than 1956, justified discounting all of his testimony—but the judge did not say this. Perhaps, instead, the judge simply did not believe that the misdeeds of Bonannee's father in 1956 could have caused Bonannee's arrest in 1973—but, again, the judge did not so state. Or the judge might have decided that while events in 1956 could cause an arrest in 1973 in Haiti, the real cause of this arrest was a fight with a militiaman, which Bonannee admitted took place, rather than any political activity. This view would treat the results of the encounter with the militiaman as not constituting § 243(h) persecution. That interpretation of the statute's scope might or might not be sustainable. *See* Part B.2, *infra*. The immigration judge, however, did not expressly adopt it.

We need not decide whether the problems which become visible on a close analysis of the agency discussion of the evidence would in themselves justify a remand. Rather, we believe these problems are significant because of the presence of possible errors of law as well.

### B. Application of Legal Principles

However controversial the review of INS factfindings may be, it is better established that the agency's actions may be scrutinized for errors of law. *See Paul v. INS*, 521 F.2d 194, 197 (5th Cir. 1975), *quoting Kan Ng v. Pilliod*, 279 F.2d 207, 210 (7th Cir. 1960), *cert. denied*, 365 U.S. 860, 81

---

10. The immigration judge's response to Coriolan's testimony about the arrest and disappearance of his mother's cousin is also problematic. Though the judge mentioned Coriolan's story of the incident, he stated no conclusions about it. He did expressly conclude that Coriolan's *immediate* family resided in Haiti unmolested. Presumably, this comment reflected an assumption that the fate of a relatively distant cousin said little about Coriolan's prospects. It seems fair to observe, however, that the relative's death for refusal to hand over a piece of cloth was relevant to the question of whether Haitian conditions are such that, as Coriolan testified, "In Haiti one doesn't have to do anything, they can just look at you and—ah—you scared."

S.Ct. 828, 5 L.Ed.2d 823 (1961); *Kovac v. INS*, 407 F.2d 102, 104 (9th Cir. 1969). *Cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94, 66 S.Ct. 1025, 90 L.Ed. 1606 (1943). *See generally* Note, *Judicial Review, supra* at 85–89. The opinion of the immigration judge in the case before us may have erred on two important legal questions.

### 1. Prosecution and Persecution for Illegal Departure

The most immediately puzzling position adopted by the immigration judge is his view of the aliens' claims that they would be prosecuted, and thus persecuted, for illegal departure from Haiti if they were returned there. The immigration judge wrote,

> "Illegal departure might possibly result in prosecution. Prosecution cannot be considered, under such circumstances, persecution because of one's political opinions."

If the immigration judge meant by this statement to assert that prosecution for the offense of illegal departure can never amount to political persecution, his view was inconsistent with decisions both of the courts and of the INS itself. *See Henry v. INS*, Nos. 76–3994, 76–3829, 552 F.2d at 131 (5th Cir. 1977) (dictum); *Berdo v. INS*, 432 F.2d 824 (6th Cir. 1970); *Kovac v. INS, supra; Matter of Janus & Janek*, 12 I & N Dec. 866 (1968).

In the face of this authority, we doubt that the immigration judge in fact meant to exclude all claims of political persecution based on the threat of punishment for illegal departure. If not, however, then we must speculate as to the actual basis for his rejection of this claim. The judge could have refused to credit the aliens' claims that they faced prosecution. It is true that the asserted fear of prosecution was supported only by general allegations as to the nature of Haitian policy. These did not have to be believed, although they did not have to be disbelieved either. But the immigration judge conceded that the aliens "might possibly" face prosecution; it is not apparent from this language whether the

judge resolved the credibility question in either direction.

Perhaps the immigration judge accepted the possibility of prosecution but rejected these claims because he did not believe that the government's reason for the prosecutions would be political. (It is not political persecution, for instance, to punish for violation of a fairly administered passport law). On this record, there was little to the contrary. But the judge never articulated this line of reasoning.

The immigration judge's opinion might also be based on a conclusion that the aliens did not depart from Haiti for political reasons. Under the INS' *Janus and Janek* decision, *supra*, the lack of a political motive for departure might be fatal to the aliens' claims, even if the motive for the stern Haitian response was political. Whether this would be the view taken by this Court is more doubtful. *Compare Henry v. INS, supra* at 131, *with Paul v. INS, supra* at 196–97. The motive test, after all, on its face does *not* test whether the government's motive for persecution is political. It may be a useful device for distinguishing more probable claims from less, but it is not at all clear that that virtue outweighs this test's potential for excluding claims apparently within the ambit of the statute. If the alien's motive for departure was the focus of the judge's attention, his apparent finding as to their motive is subject to the same questions that we have already raised above as a whole.

In short, we would have great difficulty in effectively reviewing the immigration's judge's dismissal of petitioner's fear of persecution for their illegal departure. But the failure to adequately evaluate the significance of the illegal departure is overshadowed by a more fundamental omission.

### 2. The INS' View of Haitian Political Conditions

Many—though certainly not all—of the factual conclusions of the judge suggest unstated assumptions about the nature of Haitian political life. For example, his opinion observed that there was no evidence

that Coriolan or Bonannee had ever belonged to any political organizations in Haiti. Similarly, the judge was not convinced that their political opinions differed from those of the vast majority of Haitians. These observations imply a premise: that people without overt political activity, or minority political opinions, are unlikely to be the victims of political persecution.

Solid as it sounds, this proposition is not graven in stone. It may be, in fact, that Haitian citizens can become the focus of government persecution without ever taking any conventionally "political" action at all. Petitioner Coriolan has testified that his cousin was arrested, and never heard from again, after he refused to give a Tonton Macoute member a piece of cloth. Other cases have contained similar allegations. *In Matter of Pierre*, 15 I & N Dec. (Int.Dec. # 2433, Sept. 16, 1975), a Haitian alleged that his father, a supporter of the pre-Duvalier government and a sergeant in the Haitian armed forces, had attempted to leave the armed forces in 1960, but had been murdered, and the family home burnt, because of his politics. Other members of the family allegedly had been murdered, too. (The INS denied the 243(h) claim). *See Paul v. INS*, 521 F.2d 194 (5th Cir. 1975) (extensive allegations of government murders, beatings and jailings) (§ 243(h) relief refused);[11] *Hyppolite v. INS*, 382 F.2d 98 (7th Cir. 1967). (Haitian alleged murder of her father, and friends' reports of police inquiries as to her whereabouts) (§ 243(h) relief refused); *Gena v. INS*, 424 F.2d 227 (5th Cir. 1970) (alien alleged fear of the Tontons stemming from the interest one Tonton had in his wife) (§ 243(h) relief denied).

Although almost all 243(h) claims by Haitians, and other aliens, appear to be unsuccessful, there are exceptions. One such was *United States ex rel. Mercer v. Esperdy*, 234 F.Supp. 611 (S.D.N.Y.1964). There the district court felt that Mercer's evidence lent her claim at least prima facie credibility, and held the INS' refusal to reopen its proceedings to consider the claim arbitrary and capricious. Mercer's allegations of danger from the Duvalier government were extensive. The case, however, is striking for another reason as well. The district court took judicial notice "that the present regime in Haiti may well represent a danger of physical persecution to persons such as" *Mercer*, 234 F.Supp. at 616. The court then discussed conditions in Haiti, citing extensively *New York Times* reports of Haitian affairs. These facts "widely known and reported in the press" amounted, the court felt, to the changed circumstances necessary to justify a request to reopen the INS hearing. Hence the court finally concluded that the special inquiry officer's[12] disregard of these conditions and his consequent refusal to reopen proceedings constituted an abuse of discretion.

In *Matter of Joseph*, 13 I. & N. Dec. 70 (1968), the INS approached a Haitian persecution claim in a similar spirit. Joseph's reasons for fearing persecution were, again, extremely strong. But the Board in *Joseph* also invoked the judicial notice taken by the *Mercer* court of the " 'suppression of human rights and a total nonexistence of any rule of law' . . . [and] a suspension of 'all articles of the Constitution guaranteeing individual rights, among them being free speech, freedom from arrest and police brutality' . . . . It is a matter of common knowledge and this Board takes administrative notice that conditions in Haiti have not improved to any extent since 1964." *Id.* at 72.

The *Joseph* case manifests an apparent recognition by the INS of the exceptionally oppressive conditions in Haitian life. Have matters improved since 1968? We have no way of knowing a definitive answer. Indeed, a persuasive basis for vesting substantial discretion in the Service is that the evaluation of persecution claims involves the evaluation of the political conditions of

---

11. One of the petitioners in *Paul* specifically described the political motive of the opposition to illegal departures. *See* 521 F.2d at 202–03 n. 2 (Godbold, J., dissenting).

12. At that time, the trial function, now the responsibility of the immigration judges, was performed by "special inquiry officers."

a nation—a task for which courts are not well-suited. But it is worth noting that in another recent Haitian case, an immigration judge took a bleak view of Haitian life. The immigration judge declared that "The nature of any government is properly the subject of notice. . . . Under the elder Duvalier, the government exercised extirpation of alternative leadership, suppressed civil liberties, rendered the legislative impotent and forced subservience of the bar and court. No change has been noted to date under the younger Duvalier. A man considered to be persona non grata by an absolute ruler need not have engaged in any specific conduct to earn that dubious distinction." *Matter of Guillaumette*, Files A–20 123 312, A–20 124 313 (April 18, 1974).

Coriolan and Bonannee themselves did not present evidence at their deportation hearing that could have given the immigration judge a substantial overview of Haitian political life. Even on a limited record, however, and even though it is clear that the alien asserting a persecution claim has the burden of proof, we do not believe that the immigration authorities could properly decide an alien's fate without taking note of conditions in the alien's country, to the extent that an awareness of these conditions had become a part of the INS' expertise. Indeed, the INS in the past has apparently deferred decision on groups of claims by Yugoslav and Chinese nationals until governmental agencies had compiled complete information on their countries. 2 C. Gordon & H. Rosenfield, *supra*, § 5.166 at 5.185 n. 35. Nevertheless, it may well be that the immigration judge did not abuse his discretion in viewing the record before him as raising essentially normal allegations of persecution. *See Paul v. INS*, 521 F.2d 194, 199 (5th Cir. 1975). We need not decide this point, however, because additional evidence has now been offered. Petitioners ask us to remand their case to the INS for a reopening of proceedings to receive this evidence.

## IV. THE PROFFER OF ADDITIONAL EVIDENCE

Before this court, Coriolan and Bonannee have offered materials which are at least relevant to the broad-gauge judgment of Haitian conditions which needs to be made. This material consists of a report by Amnesty International, an organization evidently devoting its efforts to the plight of political prisoners around the world. At one point this report observes,

"It is especially true that since Jean-Claude Duvalier (the son of the first President Duvalier) was declared President a Vie (life-long President) in 1971, the regime has enjoyed less severe criticism from abroad. . . . It is true that the more sensational violence of Papa Doc's days is no longer apparent— scenes such as gun battles in Port-au-Prince or bodies tied to chairs lining the roadside on the way to the airport. However, under the surface the repression is still as strong and efficient as ever it was."

Elsewhere the report discusses Haitian law enforcement.

"Arrests often take the form of disappearances or kidnappings. The families may subsequently be unable to find any trace of their missing relative. In other cases, the police or *Tonton-Macoutes* apply the 'moulinin operation,' which consists of blocking an entire neighborhood and proceeding to arrest indiscriminately as many as hundreds of citizens. Following severe interrogations, some are released, others are tortured and remain in prison.

It should be pointed out that the term 'political prisoners' has to be interpreted in the widest possible sense in the Haitian context. There may have been no political activity whatsoever, as a large number are imprisoned indiscriminately, due to technical mistakes, as a result of personal grudges, or simply for very minor offences. As in most cases there are no judicial procedures whatsoever and as torture is systematic, these prisoners are well within Amnesty International's area of concern."

Needless to say, the opinion of Amnesty International is conclusive neither upon this

Court nor upon the Immigration and Naturalization Service. But the evaluation in this report is certainly relevant. A leading immigration law treatise appears to assume that newspaper clippings or letters from townspeople can be admissible to demonstrate probable persecution, although they may be insufficient to make out a satisfactory showing. C. Gordon & M. Rosenfield, 1 Immigration Law & Procedure § 5.16b at 5–186 to 5–187 (1977). In *Matter of Sihasale*, 11 I. & N. Dec. 531 (1966) the Board of Immigration Appeals remanded a persecution case, to afford the alien an opportunity to present any obtainable pertinent evidence. The Board observed that the alien typically has no better means for discovering political conditions abroad than the average person; and that her testimony—and, surely other evidence as well—must get the most careful evaluation possible, in light of acceptable official knowledge. *Id.* at 532–33.[13] The Board is even prepared to take administrative notice of a nation's political conditions, as in the *Joseph* case which we considered above.

It is with this background that we approach the attempt by the petitioners to obtain an order from this Court reopening the proceedings below for the receipt of new evidence. The Service asserts, however, that the merits of this request are beyond our scrutiny because of the provision of the review statute, 8 U.S.C. § 1105a(a)(4) (1970) directing us to review the INS' action solely on the administrative record. The effect of this statute, as the INS sees it, is to bar a reviewing court from making use of the power to remand granted by 28 U.S.C. § 2347(c) (1970) and otherwise applicable to INS cases.

The Service reads too much into this restriction to the administrative record. Significantly, the Service cites no cases adopting this construction, nor are we aware of any. Indeed, this Court entertained a request for reopening, presented to the Court under § 2347(c), in *Paul v. INS*, 521 F.2d 194 (5th Cir. 1975). The *Paul* court denied the request, but made no suggestion that § 2347(c) was simply inapplicable to INS cases. Moreover, the review statute (8 U.S.C. § 1105a(a)(4)) can be given a less sweeping meaning without undercutting Congress' evident intent to safeguard INS discretion. Under the provisions of § 2347 applicable to some agencies, the Court of Appeals in a proper case can transfer the proceeding to the district court for a hearing and determination of genuine issues of fact. 28 U.S.C. § 2347(b)(3) (1970). We would agree without hesitation that this is beyond our powers.[14]

With the presentation of the Amnesty International report, petitioners have clearly placed in issue the question of whether Haitian political conditions are so specially oppressive that a wider range of claims of persecution must be given credence. Section 2347(c) authorizes this Court to order a remand if the additional evidence is material *and there were reasonable grounds for* failure to adduce the evidence before the agency. The materiality of the Amnesty International report is surely beyond dispute. The reasonableness of the failure to adduce the evidence before the agency is more doubtful, particularly since the petitioners presumably could have sought a reopening of the INS proceedings even after the filing of their appeal in this Court. In *Paul v. INS, supra,* this Court found the continued availability of a reopening of the

**13.** Sihasale obtained another hearing on her persecution claim, but again failed to obtain relief. On a second appeal, the Board affirmed the special inquiry officer, but again criticized his treatment of Sihasale's evidence. Speaking in this instance of newspaper articles offered by Sihasale, the Board declared that, "The evidence here under consideration did pertain to the issue at hand; it was apparently the best obtainable by the respondent; it was made part of the record by the special inquiry officer; and

we think it should have been considered by him for what it was worth." *Matter of Sihasale*, 11 I. & N.Dec. 759, 763 (1966).

**14.** Where a genuine issue of fact as to the petitioner's nationality exists, even this step, *the transfer to a district court, is expressly* made available to courts reviewing INS decisions. 8 U.S.C. § 1105a(a)(5)(B) (1970). But this is the only situation where this procedure may be adopted.

INS proceedings at least a central factor showing the unreasonableness of the petitioners' failure to adduce the evidence before the agency. 521 F.2d at 201.

In *Paul*, however, the court also concluded that the petitioners' additional evidence was not material. *Id.* Since the aliens did not demonstrate that their proffered evidence was material, moreover, their assertion that their failure to present it earlier in the proceeding was excusable also ran into difficulty. The excuse they pointed to was alleged ineffective assistance of counsel, but the failure to present immaterial evidence could hardly be ineffective assistance, and hence would not bolster a claim of excuse.

In the present case, again, materiality seems clearcut. In addition, an affidavit accompanying the Amnesty International report indicates that this report may not have become available for public use and was not (according to petitioners' brief) in the hands of their present counsel,[15] until after both the original hearing and the affirmance by the Board of Immigration Appeals. In this context, a refusal to accept the petitioners' excuse as reasonable would virtually read this remand provision out of the statute. Surely almost every agency has a provision for reopening its proceedings; surely, also, those provisions are all available to petitioners even after the case has come to the courts on appeal. If failure to utilize the provisions for reopening is fatal to a claim for relief under § 2347(c), then it would seem that there could never be such relief.

Moreover, if we refuse to entertain this claim, the petitioners will still be able to petition for an administrative reopening. An INS refusal to reopen would be reviewable for abuse of discretion. If a refusal to reopen would be an abuse of discretion, we would be remiss to launch this case on a lengthy procedural voyage to reach that decision. The impact of this report on the evaluation of Haitian conditions seems so significant that a refusal to reopen would be an abuse of discretion, unless these petitioners' claims could not be successful even if conditions in Haiti are unique. This would be the case only if these claims are barred either by legal flaws or by evidentiary weaknesses so acute as to be irremediable.

It could be argued that although Bonannee and Coriolan are likely victims of government persecution, what they face is not persecution for their "political opinion" as the statute requires. We cannot believe, however, that Congress would have refused sanctuary to people whose misfortune it was to be the victims of a government which did not require political activity or opinion to trigger its oppression.

If the potential validity of their claims as a matter of law is conceded, the weakness of the evidence supporting those claims might still be said to preclude a conclusion that any reconsideration was necessary. It seems clear, however, that Bonannee's claim might fare better on a fuller look. A recognition of the severity and the capriciousness of Haitian political life might well support Bonannee's claim that he is paying for the sins of his father in 1956. Coriolan's claim of trouble with the authorities, although undermined by his own contradictory testimony, conceivably might appear in a different light as well. Both aliens' allegations of fear of penalty for their illegal departures from Haiti might also deserve more sympathetic consideration.

We therefore must reverse and remand for a reconsideration of the claims of Bonannee and Coriolan in light of the Amnesty International report. In light of this disposition, we do not reach the petitioners' additional attacks on the proceedings below.

COLEMAN, Circuit Judge, dissenting.

As a judicial matter, I am disappointed that the majority decides this appeal in a manner directly contrary to the teachings of this Court in two cases decided within the past few months, see *Henry v. Immigration & Naturalization Service*, 5 Cir., 1977, 552 F.2d 130; *Martineau v. Immigra-*

---

**15.** The petitioners were represented by another attorney in the proceedings before the agency.

*tion & Naturalization Service*, 5 Cir., 1977, 556 F.2d 306. Both cases involved aliens illegally here from Haiti.

I am astonished that the basis for this disregard for outstanding precedent is an unauthenticated report distributed by a private group which purports to deal generally with conditions in Haiti, not the circumstances of the petitioners themselves. Moreover, even if this report were relevant it is presented for the first time on appeal.

Petitioners had the burden of demonstrating a "clear probability" of being persecuted for racial, religious, or political reasons if deported to Haiti, *Martineau, supra.* A reading of the majority opinion itself shows that Coriolan and Bonannee never came within shouting distance of meeting that burden.

The decision in *Henry* is even more compelling and admits of only one result, the deportation of these aliens who entered this Country in deliberate violation of the law, surreptitiously. Our procedures for enforcing our Immigration laws are such a paper tiger that these deliberate violators have now been here for three years and, thanks to the majority opinion, are destined to be here much longer.

In *Henry*, Judge Goldberg, for a unanimous panel, wrote that "The burden to prove probable persecution by a preponderance of the evidence rested squarely on petitioners".

*Henry* further held (1) that our authority to review the determination of petitioners' failure to meet their burden of proof is limited to whether the applicant has been accorded procedural due process and the decision reached according to the applicable rules of law and (2) whether the exercise of discretion has been arbitrary or capricious.

Significantly enough, some of the petitioners in *Henry* claimed that since they had fled the regime of Papa Doc they would be received with hostility by the present government. The Court pointed out that this allegation had been supported only by conclusory statements from personal knowledge and unauthenticated reports. This case is now being remanded on purely conclusory statements from the petitioners and in order that an unauthenticated report, offered for the first time on appeal, may be considered.

This reminds of Judge Goldberg's words in *Henry*, "Our sadness at all circumscriptions of freedom, however, is no charter to disregard the procedural system created to determine the merit of such claims".

It would appear that the *Henry* opinion has had a remarkably short life.

Coriolan's claims of probable persecution are without substantiation. When questioned, on his application for asylum, Coriolan said that he had never been arrested and had never belonged to any political organization. He said he came to the United States because the Tonton Macoutes [Haitian semi-official secret police] scared him. They had arrested his mother's cousin during the reign of the elder Duvalier [many years ago] because the cousin would not "give them a piece of cloth". The cousin had not since been seen or heard from, but Coriolan had no personal connection whatever with that alleged incident and no other member of his own family had ever been arrested. He had never talked openly against the government and had never been suspected of being a Communist. No one had ever come to his home to arrest him. The Tontons had never bothered or harassed him in any way. He was acquainted with Louis Pierre and the Tontons were about to arrest Pierre. Coriolan admitted that he *came to the United States to work* but he also had "small problems".

Bonannee had a mother, four brothers, and a sister living in Port au Prince. He had never been in the military service or belonged to any political organization. He first said that he had never been arrested at any time or place and then said that he had been arrested in Haiti in December, 1973, because his father, Ofene Belizaire, had handled political funds for Duvalier and then switched to the "Dejoie Party". At a subsequent hearing he admitted that his father had been arrested in 1956, not 1973. He said that if he returned to Haiti he would be shot.

It is no wonder that it has been publicly asserted by those in position to know that there are millions of aliens illegally in this Country, taking jobs from those who complain bitterly of the lack of job opportunity, a deficiency to be remedied by lifting more funds from law abiding taxpayers, thereby, in effect, subsidizing the illegal alien racket. There is one thing for sure—the majority opinion is not going to help in stemming the tide.

I would affirm the deportation of these petitioners in one sentence, citing *Henry* and *Martineau, supra,* as the authority for so doing.

I respectfully dissent.